In re PACIFIC EXPRESS, INC., a California corporation, Debtor.

In re PACIFIC EXPRESS HOLDING, INC., a California corporation, Debtor.

The UNSECURED CREDITORS' COMMITTEES OF PACIFIC EXPRESS, INC., AND PACIFIC EXPRESS HOLDING, INC., etc., Plaintiffs/Appellees,

v.

PIONEER COMMERCIAL FUNDING CORPORATION, etc., Defendants/Appellants.

BAP Nos. EC 86–1024 MoVE, EC 86–1215 MoVE.
Bankruptcy Nos. 2–84–00394–D–11, 2–84–00395–D–11.

United States Bankruptcy Appellate Panels of the Ninth Circuit.

Argued and Submitted Oct. 31, 1986.

Decided Dec. 24, 1986.

Joel Zeldin, Leslie Tchaikovsky, Karen Leaf, Dinkelspiel, Donovan & Reder, San Francisco, Cal., Mark Gorton, McDonough, Holland & Allen, Sacramento, Cal., for defendants/appellants.

Edward J. Tredinnick, Phelan, Stuppi, Sorensen & McQuaid, San Francisco, Cal., for plaintiffs/appellees.

Before MOOREMAN, VOLINN and ELLIOTT, Bankruptcy Judges.

MOOREMAN, Bankruptcy Judge:

By this appeal, appellants Pioneer Commercial Funding Corporation and 66 loan participants challenge the bankruptcy court's subordination of their claims. In its order concerning cross-motions for summary judgment, the bankruptcy court ruled in favor of the plaintiff unsecured creditors' committee, finding a loan transaction to be an equity participation by the investors rather than a secured loan. *See In re Pacific Express, Inc.*, 55 B.R. 913 (Bankr. E.D.Cal.1985) The basis for the subordination was the acquisition of stock by the loan participants, commonly referred to as an "equity sweetener." Alternatively, the court found that the claims should be equitably subordinated to all unsecured creditors' claims due to inequitable conduct by the loan participants. We reverse.

### FACTS

Pacific Express, Inc., and Pacific Express Holding, Inc. (both hereinafter referred to as "Pacific"), were formed with the intention of instituting commercial airline service between Los Angeles and San Francisco. The air traffic controller's strike in 1982 hampered Pacific's plan by reducing the available terminal space, foreclosing access to the desired market. Accordingly, Pacific sought to alter its service to focus mainly on smaller California cities. Pursuant to this alteration, Pacific sought and obtained accounts receivable financing from Pioneer Commercial Funding Corporation ("Pioneer"). Later in 1982, Pacific made a public offering of its stock, seeking to obtain another $10 million to support the operation. The offering netted only approximately $5.6 million, with the majority of the funds coming from existing shareholders.

In early 1983, when Pacific had a negative net worth of approximately $10 million, it was determined that additional funds would be required to continue the revised operation. After efforts to obtain further equity funding failed, Pacific entered into negotiations with Pioneer and several of its creditors to arrange a financial package whereby Pacific would obtain the necessary funds and a deferral of the collection of some of its outstanding liabilities.

The result of these negotiations was a loan participation program involving 66 participants, providing almost $4 million to

Pacific. In return for these funds, Pacific provided several items. First, a note in the amount of $4 million was given to Pioneer, which was acting on behalf of the loan participants. The loan was secured by Pacific's accounts receivable (which were also the security for Pioneer's first loan). In addition, as an "equity sweetner" to encourage participation, the company transferred to each participant 1.357 shares of its common stock for each dollar invested, amounting to a total of almost 5½ million shares being issued pursuant to the agreement. The agreement was described by the bankruptcy court as follows:

> [P]ioneer loaned $4 million to Pacific Express, Inc. at an interest rate of seven percent a year with deferred payment of the interest. Sections 7.5 and 9.1 of the participation agreement stated that the holders of 60 percent of the participation shares could direct Pioneer to declare all principal, interest, and penalties to be immediately due and payable upon the default of Pacific Express or after July 1, 1986. The specific events which would constitute a default were also listed. * *

> Section 9.2 of the participation agreement provided that upon the sale of Pacific Express Holding, Inc. common stock prior to July 1, 1986, in a private placement or pursuant to an offering registered with the Securities and Exchange Commission at a minimum price of two dollars per share and which resulted in net proceeds to Pacific Express Holding, Inc. of at least $6 million, the principal amount due Pioneer under the $4 million note would be automatically cancelled. The agreement further stated that at any time the holders of 60 percent of the participation shares could vote to cancel all principal amounts due and such a vote would have the same effect as the automatic cancellation described above.

*Id.*, 915–16.

Subsequent to the transaction, the loan participants owned approximately 65 percent Pacific's common stock. The participants included previous shareholders, directors, officers and general employees of

Pacific, as well as other lenders who had no previous contact with Pacific. In addition, a major unsecured creditor of Pacific, British Aerospace Corporation, participated in the negotiations of the loan arrangement, although it did not provide any funds under the participation agreement. The infusion of funds did not prove successful and on February 2, 1984, both Pacific entities filed bankruptcy petitions. No plan of reorganization has been submitted.

The unsecured creditor's committee, plaintiff/appellee herein, brought an action to determine the interest of Pioneer and the other loan participants. After considering cross-motions for summary judgment and oral argument by the parties, the bankruptcy court found that the transaction should be classified as a stock transfer rather than a secured loan. The court also relied upon the alternative ground that even if the transaction was a loan, the claims of Pioneer and the other loan participants should be equitably subordinated to all other unsecured claimants pursuant to 11 U.S.C. Section 510(c), on the basis of an inequitable result accomplished by the transaction.

## STANDARD OF REVIEW

As this appeal concerns the granting of a motion for summary judgment, we must review the facts *de novo*, viewing them in the light most favorable to Pacific. This Court must determine if the trial court was correct in its finding that there are no genuine issues of material fact and that the unsecured creditor's committee was entitled to prevail as a matter of law. *See Ward By & Through Ward v. United States Dept. of Labor*, 726 F.2d 516, 517 (9th Cir.1984).

## DISCUSSION

As mentioned above, the bankruptcy court set forth two reasons for subordination of the claims. First, the court indicated that under its authority to classify claims, it was able to characterize a transaction as equity rather than debt. Alterna-

tively, the court found that even if it were to construe the transaction as creating a debt, the claims were subject to equitable subordination based upon the inequitable result of the transaction.

CHARACTERIZATION AS DEBT VS. EQUITY

This Court will first address the finding of the bankruptcy court that the participation agreement was not an arm's length transaction and was an equity investment rather than a loan. The court relied upon its finding that although most of the participants were not insiders prior to the loan, they became insiders after the transfer of funds. It then applied factors normally relied upon by tax courts in concluding that the claimants' interest should be classified as equity rather than debt.

A review of the authorities in this area indicates some dispute over the standards to be used in reviewing such transactions. While one source indicates its approval of the use of factors normally utilized by a tax court in making a similar analysis, *see e.g.* Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy,* 15 Vand.L.Rev. 83, 94 (1961), others have rejected this analysis, claiming it to be irrelevant to a determination for bankruptcy purposes. *See In re Rego Crescent Corp.,* 23 B.R. 958, 962 (Bankr.E.D.N.Y.1982); *Long Island Lighting Company v. Bokum Resources Corporation,* 40 B.R. 274, 296 (Bankr.N.M.1983).

Of the authorities cited above, it would appear that the latter are more consistent with the provisions of the Bankruptcy Code. Pursuant to 11 U.S.C. Section 502(b), upon objection to a claim, the bankruptcy court "shall determine that amount of such claim...." In addition, 28 U.S.C. Section 157(b)(2)(B) provides that a bankruptcy court may determine the "allowance or disallowance of claims against the estate."

In its order, the bankruptcy court made the following statement:

If the debtors had contested Pioneer's claim the debtors could have filed an objection to claim under 11 U.S.C. Section 502(a) and R. of Bankr.P. 3007. The court then would determine the amount, characterization, and allowance or disallowance of the claim. The complaint here essentially asks the court to determine how the Pioneer participants' claim should be characterized. The court's power to characterize these claims is consistent with the Code.

*In re Pacific Express, Inc.,* 55 B.R. 913, 919 (Bankr.E.D.Cal.1985).

■ A review of the above statement indicates that the court has construed its authority too broadly. While the Code supports the court's ability to determine the amount and the allowance or disallowance of claims, those provisions do not provide for the characterization of claims as equity or debt. The result achieved by such a determination, i.e. subordination, is governed by 11 U.S.C. Section 510(c). Where there is a specific provision governing these determinations, it is inconsistent with the interpretation of the Bankruptcy Code to allow such determinations to be made under different standards through the use of the court's equitable powers. *See e.g. Johnson v. First National Bank of Montevideo,* 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984), ("[a]lthough a bankruptcy court is essentially a court of equity, its broad equitable powers may only be exercised in a manner which is consistent with the provisions of the Code." (citations omitted)). Accordingly, the bankruptcy court's characterization of the transaction as an equity investment rather than a loan is vacated.

Further, as pointed out by the Fifth Circuit, "[i]t is important to remember that the issue is not whether the advances 'actually' were loans, but whether equity requires that they be regarded as if they were something else." *Matter of Mobil Steel Co.,* 563 F.2d 692, 702 (5th Cir.1977). Therefore, this Court will now address whether subordination of the claims was required.

## EQUITABLE SUBORDINATION

■ As mentioned above, the appropriate provision to consider in making a determination of whether a claim is to be subordinated is 11 U.S.C. Section 510. Although the Ninth Circuit has addressed this topic in previous decisions, *see e.g. In re Westgate-California Corp.*, 642 F.2d 1174, 1177–78 (9th Cir.1981); *In re Ahlswede*, 516 F.2d 784, 788 (9th Cir.), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975); *Frasher v. Robinson*, 458 F.2d 492, 493 (9th Cir.), *cert. denied*, 409 U.S. 1009, 93 S.Ct. 443, 34 L.Ed.2d 302 (1972), it has not established clear guidelines to be applied to facts such as those presented herein. In an attempt to apply a more uniform approach to such determinations, this Court will utilize the standard as set forth in *Matter of Mobil Steel Co.*, 563 F.2d 692, 702 (5th Cir.1977). Accordingly, the proper standards to be applied in this context are as follows:

(i) The claimant must have engaged in some type of inequitable conduct.

(ii) The misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant.

(iii) Equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act.

*Matter of Mobil Steel Co.*, *supra*, at 700. In the application of these three conditions, the Court in *Mobil* also set forth three principles which may be considered:

a) Inequitable conduct directed against the bankrupt or its creditors may be sufficient to warrant subordination of a claim irrespective of whether it was related to the acquisition or assertion of that claim.

b) A claim or claims should be subordinated only to the extent necessary to offset the harm which the bankrupt and its creditors suffered on account of the inequitable conduct.

c) The burden of proving all the elements of subordination is on the objectant. If the validity of the underlying claim is in issue, the claimant has the burden of providing both the amount and legitimacy of his claim. However, once that burden has been satisfied, the objectant must prove by a preponderance of the evidence that the claimant engaged in such substantial inequitable conduct to the detriment of the debtor's other creditors that subordination is warranted.

*Id.*, at 700–01; *Matter of Teltronics Services, Inc.*, 29 B.R. 139, 168–69 (Bankr.E.D. N.Y.1983). Upon the application of these standards to the facts herein, this Court finds that the bankruptcy court erred in what appears to have been a sua sponte subordination of the claims of the loan participants.

## NON–INSIDER STATUS OF CLAIMANTS

First, a determination of the status of the claimant must be made:

The primary distinctions between subordinating the claims of insiders versus those of non-insiders lie in the severity of misconduct required to be shown, and the degree to which the court will scrutinize the claimant's actions toward the debtor or its creditors. Where the claimant is a non-insider, egregious conduct must be proven with particularity. It is insufficient for the objectant in such cases merely to establish sharp dealing; rather, he must prove that the claimant is guilty of gross misconduct tantamount to "fraud, overreaching or spoliation to the detriment of others." Where the claimant is an insider, his dealings with the debtor will be subjected to more exacting scrutiny. If the objectant comes forward with sufficient substantiations of misconduct on the part of the insider claimant, the burden will shift to the insider to establish that each of his challenged transactions with the debtor had all the earmarks of an arm's length bargain.

*Matter of Teltronics Services, Inc.*, *supra*, at 169, (citations omitted); *See also Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939).

■ In the present case, there is no dispute that two of the 66 loan participants were shareholders prior to the transaction. In addition, several of the loan participants became directors and executives with Pacific after the transaction, although there was no previous relationship between themselves and the corporation. Notwithstanding the above, the vast majority of the participants were either non-management employees[1] of Pacific or lenders with no previous contact with the corporation.

Based upon this composition, the trial court found the entire group of loan participants to be insiders, thereby subjecting the transaction to close scrutiny. Such a judicial classification is improper. While the involvement of a non-insider in a transaction does not avoid a close scrutiny analysis, in a situation where the vast majority of the participants in a transaction are not insiders, the need for such close scrutiny diminishes or vanishes proportionately.

*Pepper v. Litton, supra,* and cases subsequent to it sought to prevent inequitable results caused by insider transactions which were for the benefit of the officer, director or stockholder rather than in the best interest of the corporation and others interested therein. In the present case, outside participants were sought for the loan program and Pacific's largest unsecured creditor, British, was involved in the negotiations of the very transaction it also now seeks to subordinate. It can hardly be said that after such exposure, the transaction must now be viewed with close scrutiny to determine if harm might have occurred to others involved with Pacific.

The fact that two of the participants owned 26 percent of the participation shares and were insiders does not alter this result. First, pursuant to the terms of the loan, any rights which might have been exercised required at least 60 percent of the participants' shares. Accordingly, these two insiders held neither a controlling interest of the participation group nor of the corporation. Further, the transaction was negotiated by other parties as well, including Pioneer and British, thereby fully disclosing the transaction to examination by creditors of Pacific. It is also important to note that the conduct of the participants after the loan was made has not been challenged. Were it at issue, use of the insider classification may have been a consideration. However, the real question presented herein concerns the status of the participants prior to and during the negotiation and completion of the loan agreement. On the undisputed facts presented, it is clear that at the time of the transaction, the vast majority of the loan participants did not have sufficient control or power over Pacific such that they should now be characterized as insiders and/or fiduciaries.

■ Accordingly, the burden upon the unsecured creditors' committee is to prove "gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.'" *Matter of Teltronics Services, Inc., supra,* at 169 (citations omitted). The undisputed record in this matter indicates that the objectors have failed to meet their burden in their pleadings and on the facts.

## NO EVIDENCE OF INEQUITABLE CONDUCT

■ In finding inequitable conduct the bankruptcy court relied upon the fact that due to the terms of the loan participation agreement, the participants had effectively shifted the risk of loss to other creditors. By accepting stock as part of the agreement, the participants had allegedly insulated themselves from risk. If the business failed, they could look to their security as repayment; if it prospered, they could cancel the debt and keep the stock. The court indicated that this inequitable result

---

1. Evidence was presented by way of affidavits that the employees' primary concern in providing the funds was to protect their jobs with Pacific. As many borrowed the funds which were provided to Pacific pursuant to the loan participation agreement, they have suffered their own financial difficulties, in addition to loss of employment.

was sufficient to satisfy the requirement of inequitable conduct. This Court disagrees.

At the time of the loan, Pacific had a negative net worth of approximately $10 million. It had been unsuccessful in its attempts to raise the necessary operating funds through stock offerings, managing to acquire only approximately one-half of the needed funds, mostly from existing shareholders. After having exhausted its sources of investment funds, it was forced to seeking willing lenders. Due to its poor financial situation, such a loan was made at great risk by the lenders. Accordingly, the terms of the loan participation agreement were drafted to include an "equity sweetener" to make the bail-out loan more attractive to potential lenders. Pacific's largest unsecured creditor, British, joined in the negotiations of the loan, agreeing to defer collection of its claims if there was sufficient participation by the employees of Pacific as an indication of its good faith. With its loan participation agreement, Pacific was able to raise another $4 million, notwithstanding its large negative net worth.

On this record, the objectors have not met their burden of proof of showing that the claimants engaged in inequitable conduct. Although the transaction may have placed the loan participants in a better position than other unsecured creditors, there is no evidence of the type of overreaching, fraud or other conduct which would justify subordination of a non-insider's claim. In fact, the unsecured creditors' committee conceded in their briefs and during oral argument before the trial judge that they did not "know of any inequity or inequitable conduct."

Therefore, although the trial court properly found that there are no genuine issues of material fact, the record in this matter does not support the bankruptcy court's determination that the claims should be subordinated. The objectors have failed to meet their burden of proof regarding inequitable conduct. Accordingly, the order of the bankruptcy court is REVERSED, the judgment vacated and this matter is hereby REMANDED with instructions that judgment be entered in favor of the claimants.