In re Jack FRIEDMAN, Debtor.

Jack FRIEDMAN, Appellant,

v.

SHEILA PLOTSKY BROKERS, INC.,
et al., Appellees.

BAP No. CC–90–1312–VOJ, Bankruptcy
No. LA 87–08173–LF and Adv. No.
LA 87–02177–LF.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted Oct. 19, 1990.

Decided April 10, 1991.

David Weinstein, Los Angeles, Cal., for appellant.

Robert P. Gordon, Los Angeles, Cal., for appellees.

## OPINION

Before VOLINN, OLLASON and JONES, Bankruptcy Judges.

VOLINN, Bankruptcy Judge:

Appellant/debtor Jack Friedman invested in Texas real estate over a period of five years with the assistance of appellee real estate brokers. Friedman became indebted to appellees on a debt secured by a deed of trust to Friedman's real property. Appellees recorded the deed of trust five months after its execution. Appellant filed his Chapter 11 bankruptcy petition nine months after the recordation, and sought to avoid the trust deed lien as a preferential transfer to an insider. The trial court held that appellees were not insiders, and entered judgment in their favor. This appeal followed. We AFFIRM.

## I. FACTUAL AND PROCEDURAL BACKGROUND

A detailed recitation of the events of this case is necessary in view of appellant's allegation that appellees were insiders for purposes of the one-year preference period. The record and the findings, which are essentially uncontested by appellant, show the following:

Appellant Friedman, a real estate developer, formed and controlled a number of joint ventures investing in Texas real estate, initially in the Houston area. Appellant became interested in the investment possibilities in the Austin, Texas area, and to that end became involved with appellees Sheila Plotsky and Penny Barstow in 1981.

Ms. Plotsky and Ms. Barstow were real estate brokers licensed to practice in Texas. Ms. Plotsky was the sole shareholder, director, president and principal of Sheila Plotsky Realtors, Inc., and Sheila Plotsky Brokers, Inc., both of which are Texas corporations and appellees in this action. Appellees were experienced brokers in the residential real estate market in and around Austin, and held a positive reputation as such in the community.

When Friedman first became acquainted with Ms. Plotsky, he had no business background in Austin, nor was he connected with any local bank or legal counsel. He relied considerably on appellees and ultimately provided them with so large a volume of business that by 1984 it was virtually all of their business.[1] Between 1983 and 1986 Barstow devoted substantially all her time to Friedman's business.

The findings entered below describe a relationship among the parties which displays or reflects the intensity of communication needed to effect the business Friedman developed. Friedman spoke to Barstow by telephone in excess of a thousand times each year from mid–1981 and mid–1986, and with Plotsky approximately a hundred times a year during that same period. The numerous contacts led to a certain amount of personal interchange.

---

**1.** Friedman never executed written listing agreements with appellees, although he did sign a memorandum in 1986 identifying certain tracts which were then for sale, with stated prices and the commission figure payable for such sales of six percent.

Friedman became a significant customer of BancFirst–Austin, of which Plotsky was a member of the board of directors. He developed a substantial banking relationship with the Texas Commerce Bank. Friedman also had checking accounts with six banks in the Austin area. He gave appellees signatory rights on these accounts, but these rights were limited to the writing of specific checks at Friedman's direction and under his instructions. Appellees did not have any discretion to use any of the account's funds other than as Friedman directed. They signed many checks on Friedman's accounts but the checks were always for his business expenses, such as payment on mortgage debts, real property taxes, insurance and development charges.

Friedman also left with appellees presigned promissory notes in favor of various banks. The notes were left blank as to amounts and terms and were intended to allow appellees to quickly obtain loans for Friedman when an investment opportunity presented itself.[2] Appellees also had in their files copies of Friedman's personal financial statements during the time in question. The statements were signed in blank by Friedman for appellees to fill in when he supplied appellees with information in order that they could be delivered to banks as circumstances required.

The trial court's findings detail a number of transactions wherein Friedman permitted Plotsky to acquire his interest in various properties without much, if any, profit to him. He also paid Plotsky referral fees for introducing him to persons who would later invest in his various ventures, including referral fees to Plotsky for investments by several of Plotsky's children. These referral fees were voluntary and suggested by Friedman after the referrals had in fact been made. The trial court found that the payment of the referral fees was not in response to a calculated effort on the part of appellees to increase their compensation through the introduction of potential investors.

On at least fifteen occasions appellees deferred their sales commissions which came due on the acquisition or sale of investment of real property by Friedman. All the deferred commissions were ultimately paid except for $78,000 on one sales account and $82,000 on another. Appellees took notes in those amounts for the deferred commissions. The trial court found that the deferral of commissions was a common and ordinary practice in the Austin area during the time in question, 1981 to 1986, and that Plotsky made the decision to defer commissions on a case-by-case basis.

Eventually, Friedman's business operations required more money, and on February 26, 1986 appellees loaned him $275,000.[3] Friedman combined the obligations evidenced by the deferred commission notes and the loan into a single real estate lien note in the amount of $435,000 in favor of Sheila Plotsky Brokers, Inc. The note was due on February 26, 1987 and was secured by a deed of trust delivered on March 3, 1986 encumbering certain of Friedman's real estate. Appellees did not then record the trust deed.

At some point during the first half of 1986, Friedman began to experience a downturn in his business, generally as a consequence of adverse economic conditions in the southwestern part of the United States. In June, 1986 Friedman met with appellees in Austin, where he made them aware that his business was near collapse because of the continued slowdown in the local real estate market. In late July, 1986 Plotsky met with Friedman in California seeking payment of the $435,000 note. Friedman paid Plotsky no portion of the note, nor did he give her any

---

2. The record, however, does not indicate what, if any, discretion appellees had in connection with the use of these notes. Friedman has not argued that appellees were vested with any sort of discretion.

3. Plotsky obtained the funds on behalf of Sheila Plotsky Brokers from BancFirst Austin by way of a personal loan under special provisions available only to bank directors. The record also makes reference to a $250,000 loan to Friedman in March, 1985, again using funds Plotsky obtained on behalf of Sheila Plotsky Brokers. There is no indication regarding if and when this loan was repaid.

indication as to when it would be paid.[4] At this point in time, the relationship of the parties was patently of an adversarial nature.

Upon Plotsky's return to Austin, appellees visited several of Friedman's banks and attempted to draw enough funds to pay the $435,000 debt. Plotsky was unsuccessful because the accounts at banks she contacted were either empty or blocked, but Barstow managed to obtain $24,000 in cash and cashier's checks. However, concerned about the propriety of this action, Barstow within a matter of days returned the $24,000 to Friedman.[5]

Failing to find significant funds in Friedman's bank accounts, Plotsky recorded the deed of trust on August 5, 1986 without any prior notice to or approval from Friedman. Friedman's financial problems thereafter continued, resulting in his filing a petition under Chapter 11 of the Bankruptcy Code[6] on April 24, 1987.

On November 17, 1987 appellees initiated this controversy by filing a complaint under § 523(a)(2) seeking to determine the dischargeability of Friedman's debt to them.[7] On February 29, 1988 Friedman answered and asserted a number of counterclaims, among them that (1) appellees' recordation of the deed of trust constituted a preferential transfer; and (2) appellees' claim should be equitably subordinated pursuant to § 510(c).[8]

Trial was originally set for April 17, 1989. A few days before that date, appellees' counsel became suddenly and seriously ill, and as a result the trial was continued until July 21, 1989. At the close of appellees' case, Friedman moved for and was granted a dismissal of appellees' complaint under Bankr.Rule 7041, the trial court finding that appellees had failed to sustain their burden of proof under § 523.[9]

The court proceeded with Friedman's counterclaims, and at the conclusion of trial made a number of findings relative to the nature of the relationship between Friedman and appellees. Specifically, the court found that appellees did not know with particularity the investors who participated in each of Friedman's joint ventures, that appellees were not in control of any of Friedman's business affairs, and that the bank accounts to which they had access were solely for Friedman's use and benefit. The court also found that Friedman and appellees had no agreement to generally share profits and losses from Friedman's business affairs. The court further found that the activities and relationships of appellees respecting Friedman fell "squarely within the range of normal activities of a Texas real estate broker doing business in and around Austin, Texas between 1981 and 1986." The court ultimately found that none of the appellees were insiders of Friedman within the meaning of 11 U.S.C. § 101(30), and that appellees did not obtain the trust deed lien by means of any acts or practices unfair or inequitable to other creditors of the estate.

The court concluded that the recordation of the deed of trust was not avoidable by Friedman as a preferential transfer because it occurred more than 90 days prior to bankruptcy, and was not made to or for

---

4. As indicated above, the note by its terms was not due until February 26, 1987.

5. The trial court found that Friedman suffered no loss as a result of the withdrawal of funds from his account.

6. Unless otherwise indicated, all chapter and section references herein are to the Bankruptcy Code, 11 U.S.C.A. §§ 101–1330 (West Supp. 1991).

7. Appellees alleged that Friedman had fraudulently induced them to extend him the $275,000 loan based on false representations, false pretenses, or actual fraud.

8. Section 510(c) provides that:

 Notwithstanding subsections (a) and (b) of this section, after notice and hearing, the court may—
 (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or
 (2) order that any lien securing such a subordinated claim be transferred to the estate.

9. Appellees have not appealed from the dismissal of their dischargeability action.

the benefit of an insider of the debtor. The court also concluded that the liens created by the recordation should not be subordinated to the costs of administration or any other claims against the estate. Friedman timely appealed.

## II. ISSUES

Friedman identifies five issues on appeal which may be stated as follows:

1. Whether appellees were "insiders" within the meaning of § 101(30), for purposes of application of the one-year preference period under § 547(b)(4)(B);

2. Whether equitable considerations dictate that appellees' mortgage lien be subordinated to the interests of other creditors;

3. Whether the trial court abused its discretion:

(a) in allowing appellees' counsel to use a previously excluded transcript as a cross examination aid;

(b) in denying Friedman's motion to re-open the case;

(c) in refusing to allow appellant costs after the trial was continued for three months because of illness to appellees' former counsel.

## III. STANDARD OF REVIEW

■ The determination of insider status is a question of fact. *Matter of Missionary Baptist Found.*, 712 F.2d 206, 210 (5th Cir.1983); *In re UVAS Farming Corp.*, 89 B.R. 889, 892 (Bankr.D.N.M.1988); *In re Taylor*, 29 B.R. 5, 7 (Bankr.W.D.Ky.1983); 2 *Collier on Bankruptcy* ¶ 101.30, at 101–72 (15th ed. 1990). We review the bankruptcy court's findings of fact for clear error. *In re Torrez*, 63 B.R. 751, 753 (9th Cir.BAP 1986), *aff'd* 827 F.2d 1299 (9th Cir.1987). Where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly erroneous. *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985).

Friedman contends that, because the facts herein are "largely undisputed," we must review the trial court's finding that appellees were not insiders *de novo*. In support of this argument, Friedman cites *In re Schuman*, 81 B.R. 583 (9th Cir. BAP 1987), which observes that in certain circumstances it may be more accurate to consider the determination of insider status as a mixed question of fact and law. In responding to the argument that summary judgment was improper because insider status is a factual determination, *Schuman* states:

> The Panel agrees that the insider determination might be considered a 'question of fact' in the sense that it is made on a case-by-case basis, after the consideration of various factors. Nevertheless, where the underlying facts are undisputed, a trial court is free, on a motion for summary judgment, to determine whether the established facts satisfy the statutory standard. In this sense, it would be more accurate to consider the insider determination as a mixed question of law and fact.

*Schuman*, 81 B.R. at 586 n. 1.

Friedman is attempting to invoke both standards, *de novo* and clearly erroneous. However, Friedman does not appeal from a summary judgment, as did the appellant in *Schuman*, but from an adverse judgment following trial based on detailed findings of fact. While Friedman largely argues that the findings are undisputed, and that the court's conclusions therefrom are erroneous, he hedges his bets with some contention that the trial court's findings themselves were erroneous. Thus we are urged to review the findings on a *de novo* basis and also under the clearly erroneous standard. While appellant's principal arguments are directed to *de novo* considerations, our determinations are based on considerations which are consistent with clearly erroneous standards insofar as they are applicable.[10]

**10.** Friedman similarly argues that the trial court's "determinations" regarding equitable subordination should also be subject to *de novo* review. The court's conclusion in this regard was based on its findings that appellees did not obtain their deed of trust in a manner unfair or inequitable to other creditors, and that they violated no duty owed Friedman. These find-

## IV. DISCUSSION

### A. Record on appeal.

We are hampered in our effort to substantively review this case by the failure of both parties to fully comply with the Federal Rules of Appellate Procedure and the Bankruptcy Appellate Panel Rules. F.R. A.P. 10(b)(2) provides that:

> If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the evidence, the appellant shall include in the record a transcript of *all* evidence relevant to such finding or conclusion.

(emphasis supplied.) While we may, consistent with the clearly erroneous standard, affirm the trial court's decision based upon any evidence appearing in the record, our task has been made difficult by the failure of either party to provide us with, and specifically reference to, those portions of the record wherein support for their respective positions is asserted to be found.

In *In re Burkhart*, 84 B.R. 658 (9th Cir. BAP 1988), we were similarly faced with a record on appeal the scantness of which made review under the clearly erroneous standard difficult. The appellants there had failed in their brief to cite to the record in support of many of their assertions, and only supplied the Panel with a portion of the record on which the trial court relied. In an attempt to discourage this sort of practice by litigants appearing before us in the future, we observed that:

> There is a trend in appellate courts to have the parties supply excerpts of the

trial record for review on appeal. The practice is an attempt to improve efficiency by reducing the size of extraneous material the Panel must review. The Panel's efforts at economy and efficiency are hindered, however, where parties indiscriminately omit important documents or include copies from the parties' files instead of copies filed with the court which show the date a document was entered, or in the alternative fail to include a copy of the trial court's docket. Appellants should know that an attempt to reverse the trial court's findings of fact will require the entire record relied upon by the trial court be supplied for review.

*Burkhart,* 84 B.R. at 661.[11]

 In this case, although Friedman supplied us with a substantial record amounting to some fourteen hundred pages, only selected portions of the trial transcript are provided. The trial court's oral opinion, from which we might more specifically discern both the basis for its extensive findings, and the portions of the record on which it relied to arrive at those findings, is absent. As the record presently exists, we would be justified in affirming the decision below on the basis that Friedman has not made reference to nor supplied us with those portions of the record indicating the commission of clear error. *Cf. Southwest Administrators, Inc. v. Lopez,* 781 F.2d 1378 (9th Cir.1986) (appeal dismissed for appellant's failure to provide trial transcript.). An appellate court is not

---

ings are also subject to the clearly erroneous standard.

**11.** Following our decision in *Burkhart* B.A.P. Rule 4 was amended to address the concerns raised in that case. While the effective date of the amended rule, July 24, 1990, makes it strictly inapplicable to the present case, we note that Rule 4(c) currently provides that:

> Pursuant to Bankruptcy Rule 8009(b)(9), the excerpts of record shall include the transcripts necessary for adequate review in light of the standard to be applied to the issues before the panel. The panel is required to consider only those portions of the transcript included in the excerpts of record.

The Explanatory Note to the amended rule indicates the intent of the amendment:

> Subsection (c) ... was added to address the problem created by appellants who challenge the factual findings of the bankruptcy court, but who do not include sufficient transcripts in the excerpts of record to allow the panel to properly review the bankruptcy court's decision for clear error. In order to review a factual finding for clear error, the record must include the entire transcript and all other relevant evidence considered by the bankruptcy court (citation omitted). You are also referred to Bankruptcy Rule 8010(a)(1)(D) which addresses the related problem created by appellants who do not make explicit references to the parts of the record that support their factual allegations and arguments. Opposing parties and the court are not obliged to search the entire record unaided for error....

obligated to search the record for error. *McDowell v. Safeway Stores, Inc.*, 753 F.2d 716, 717 (8th Cir.1985). Nevertheless, we have reviewed the record provided to us in order to determine whether the trial court's findings meet the clearly erroneous standard.[12]

### B. Insider Status.

Friedman seeks to avoid appellees' lien as a preferential transfer under § 547. One essential element of a preferential transfer is that the transfer must have occurred

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if [the transferee] creditor at the time of such transfer was an insider ...

§ 547(b)(4)(A), (B). Here it is undisputed that the transfer complained of occurred when appellees recorded their lien on August 5, 1986, or greater than 90 days prepetition. Friedman can thus only avoid the transfer as a preference if appellees were insiders.

Section 101(31) defines the term "insider," and provides in pertinent part as follows:

In this title—

. . . .

(31) "insider" includes—

(A) if the debtor is an individual—

(i) relative of the debtor or of a general partner of the debtor;

(ii) partnership in which the debtor is a general partner;

(iii) general partner of the debtor; or

(iv) corporation of which the debtor is a director, officer, or person in control. . . .

§ 101(31)(A). The Code similarly establishes which individuals or entities may be insiders in cases in which the debtor is a corporation,[13] partnership[14] or municipality.[15] The use of the word "includes" is indicative of Congress' intent not to limit the classification of insiders to the statutory definition. *Schuman*, 81 B.R. at 586; *see also* § 102(3) ("includes" and "including" are not limiting.).

While the respective insider definitions do not attempt or purport to be all inclusive, it may be fairly said that each definition is based on either one of two relational classifications. First, the Code assigns insider status to entities or relatives[16] of the debtor, or of persons in con-

---

**12.** Although responsibility to file an adequate record rests with the appellant, *see Burkhart*, 84 B.R. at 660, appellees here are not without fault, having in no way supplemented the record supplied by Friedman. Appellees' only citation to the record references particular findings, rather than those portions of the record which support each finding. Accordingly, we are left with the onerous task of searching through a voluminous, yet partial, record to discover whether there is support for the trial court's findings. Even though the burden is on the appellant to show that a finding is clearly erroneous, *id.,* it is a dubious practice for an appellee to solely rely on the appellant to supply an adequate record, unless satisfied it has done so, and in any event to abdicate its responsibility to direct the reviewing court to specific evidentiary support for the findings which are the subject matter of the appeal.

**13.** *See* § 101(31)(B), which provides that insiders of a corporate debtor include:

(i) director of the debtor;

(ii) officer of the debtor;

(iii) person in control of the debtor;

(iv) partnership in which the debtor is a general partner;

(v) general partner of the debtor; or

(vi) relative of a general partner, director, officer, or person in control of the debtor. . . .

**14.** *See* § 101(31)(C), which provides that insiders of a partnership debtor include:

(i) general partner in the debtor;

(ii) relative of a general partner in, general partner of, or person in control of the debtor;

(iii) partnership in which the debtor is a general partner;

(iv) general partner of the debtor; or

(v) person in control of the debtor. . . .

**15.** Section 101(31)(D) provides that if the debtor is a municipality, insiders include "elected official[s] of the debtor or relative of an elected official of the debtor."

**16.** Section 101(45) defines a "relative" as follows:

[An] individual related by affinity or consanguinity within the third degree as determined by the common law, or individual in a step or adoptive relationship within such third degree.

trol of a related entity, whose affinity or consanguinity gives rise to a conclusive presumption that the individual or entity commands preferential treatment by the debtor. Second, insider status may be based on a professional or business relationship with the debtor, in addition to the Code's *per se* classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.

These classifications find support in the legislative history of § 101(24) [now (31)], which provides that:

[a]n insider is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms length with the debtor.

H.R.Rep. No. 95–595, 95th Cong., 2d Sess. 312 (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6269. As indicated above, the determination of insider status is a question of fact. *UVAS Farming Corp.*, 89 B.R. at 892.

The case law that has developed also indicates that not every creditor-debtor relationship attended by a degree of personal interaction between the parties rises to the level of an insider relationship. *See In re Huizar*, 71 B.R. 826 (Bankr.W.D.Tex.1987) (Despite defendant bank's president having been a close personal friend of debtor, having solicited debtor's business, having become debtor's primary lender, and having taken at least one vacation with debtor, bank was not an insider given lack of evidence indicating that the transactions between the parties were anything other than properly negotiated loan transactions, nor that the bank held any form of actual or unreasonable control over the debtor); *In re Hartley*, 52 B.R. 679 (Bankr.N.D. Ohio 1985) (trustee could not avoid as insider preference stock pledge made to bank despite the fact that bank frequently advanced monies to purchase the stocks); and *In re Technology For Energy Corp.*, 56 B.R. 307 (Bankr.E.D.Tenn.1985) (court re-

jected contention that secured creditor-bank was insider of debtor, notwithstanding that bank had voting control over debtor pursuant to a stock pledge).

A common basis for these rulings was the perception that, while a creditor may be in a strong bargaining position in dealing with the debtor, so long as the parties transact their business at arm's length, such circumstances do not necessarily give rise to insider status even though there was some degree of personal relationship with the debtor. It is unlikely that Congress intended that complex business relationships existing over a period of time, attended by some personal involvement but without control by the creditor over the debtor's business, would subject such creditor to insider status.

■ Here the record indicates that, while appellees performed a wide variety of tasks on Friedman's behalf, these tasks were of a particularized nature and were performed for specific purposes unrelated to the overall direction or control of Friedman's business. The trial court found that appellees were not in control of any of Friedman's business affairs at any point during the relevant period, and that there was no agreement among the parties to share profits and losses from the real estate transactions. These findings are supported by the record.

The transaction that formed the basis for Friedman's preference claim was appellees' recordation of their trust deed. There is no indication that the parties negotiated and executed the trust deed and the underlying note at anything other than arm's length. There is nothing in the record to suggest that appellees were without the right given any other creditor to record their deed at the time they did so. The long term and extensive relationship between the parties does not compel a conclusion that appellees were granted a security interest because of insider status. While the action taken by appellees when they recorded the security instrument for which they had furnished consideration may have been contrary to Friedman's wishes, the die was cast when he gave them the deed of trust.

Friedman argues that appellees' ability to withdraw money from his bank accounts, and their aborted attempt to exercise that ability to secure payment on their note, establishes that appellees were insiders. Friedman asserts that if appellees had been successful in finding and obtaining funds sufficient to pay off the note, there would be no question as to appellees' insider status. At the post-trial hearing on Friedman's motion for reconsideration,[17] the trial court addressed this argument as follows:

If your argument were correct, then a bookkeeper who embezzled money would constitute somebody subject to this standard and I don't think that's what the law intends. Because the bookkeeper may have [the] actual ability to move funds from the debtor's accounts into their own personal accounts to the detriment of the debtor and other creditors and that's really the standard that you're arguing: ability to cause the funds to be moved. It's clear to me that they didn't have the authority to do [so] under the circumstances, that it was all carefully circumscribed and they weren't making the decisions about it, about when and where and how the money was to be moved, except under careful instructions from Mr. Friedman. . . .

There is substantial support in the language above for the trial court's finding that appellees were not insiders. Assuming that another fact finder could have found differently, where there are two permissible views of the evidence the fact finder's choice between them cannot be clearly erroneous. *Anderson,* 470 U.S. at 574, 105 S.Ct. at 1511.

In the course of oral argument on appeal, Friedman also alluded to appellees having been given a general power of attorney. Again, we find there is nothing in the record which suggests that appellees functioned on a scale of such unlimited discretion as would invest them with an ability to order, organize or direct Friedman's operations.

Friedman argues that *In re EMB Associates, Inc.,* 92 B.R. 9 (Bankr.D.R.I.1988), is analogous to the present case and supports the proposition that appellees were insiders. There, however, the defendant's principal used his position and the information gained as the debtor's accountant to arrange for a loan from defendant ABD to the debtor which the court found was both burdensome to the debtor and structured to make the debtor's subsequent default a certainty. In this case, all indications are that the subject note and deed of trust were executed in an adversary atmosphere and at arm's length. *EMB* therefore does not support Friedman's position.

## C. *Equitable Subordination.*

Section 510(c)(1) provides, in part, that the bankruptcy court may "under principles of equitable subordination, subordinate for purposes of distribution ... all or part of an allowed interest to all or part of another allowed interest...." Friedman argues that appellees conduct in this case dictates that their lien be subordinated to the claims of other estate creditors.

■ Equitable subordination requires that: (1) the claimant who is to be subordinated have engaged in some type of inequitable conduct; (2) the misconduct resulted in some type of injury to competing claimants or unfair advantage to the claimant; and (3) subordination is not inconsistent with bankruptcy law. *In re Universal Farming Indus.,* 873 F.2d 1334, 1337 (9th Cir.1989); *In re Pacific Express, Inc.,* 69 B.R. 112, 116 (9th Cir. BAP 1986). The burden of establishing all the elements of subordination by a preponderance of the evidence is on the objecting party. *Pacific Express,* 69 B.R. at 116. Where, as here, the claimant is not an insider, the objecting party "must prove that the claimant is guilty of gross misconduct tantamount to 'fraud, overreaching or spoliation to the detriment of others.' " *Id. (quoting Mat-*

---

**17.** As indicated above, Friedman failed to supply us with a transcript of the trial court's oral ruling at the conclusion of the trial.

*ter of Teltronics Services, Inc.*, 29 B.R. 139, 169 (Bankr.E.D.N.Y.1983) (citations omitted)).

■ There is no indication in the record here of any acts on the part of appellees which would rise to the level of gross misconduct and dictate that their claim be subordinated. The trial court found that appellees violated no fiduciary duty, or any other duty, owed Friedman, nor did appellees acquire and perfect the deed of trust by virtue of any practices unfair or inequitable to other creditors. These findings must be accepted unless clearly erroneous. *Torrez*, 63 B.R. at 753. The record supports the findings on which the trial court's conclusion was based, and the court properly applied the correct standard in concluding that subordination was not warranted.

*D. Miscellaneous Issues.*

1. Use of excluded transcript.

■ Appellees' counsel during the cross-examination of a witness made several references to the transcript of the witness' earlier deposition testimony which the court had previously excluded. After approximately an hour of cross-examination, the court *sua sponte* repeated an earlier admonishment of appellees' counsel for his use of the transcript. At the close of cross-examination, Friedman's counsel moved to strike it in its entirety. The court denied the motion, stating that, "It does not appear to me that the questions at issue were terribly material or prejudicial of the character that justifies striking them." Based on the record, it would appear that there was no demonstrable prejudice to Friedman from the use of the transcript.

2. Denial of motion re-open the case.

Following trial Friedman moved to reopen the case, alleging that after the trial he became aware of unspecified evidence which purportedly would have established that Plotsky had lied during her testimony

and concealed evidence regarding her control over Friedman's property. The trial court denied that motion by order dated January 19, 1990. Pleadings filed below indicate that the newly-discovered evidence consisted entirely of a statement Plotsky allegedly made to Friedman following trial to the effect that the only reason Friedman's properties did not sell during 1986 was that Plotsky was angry with Friedman. At the hearing on Friedman's motion, the court concluded that

> The supposed new evidence asserted, in my view, is insufficient and untimely and does not warrant reopening of the trial and it appears to be speculative at best, denied by the other side; and at worst [it is] insufficient on its face to warrant a different result by itself.

The trial court clearly considered the value of the proffered new evidence on its merits and concluded that it provided an insufficient basis to merit the relief sought. Friedman has not presented any basis other than argument for us to conclude that the denial of the motion was an abuse of discretion.[18]

## CONCLUSION

Appellees, primarily as brokers, facilitated appellant's real estate investments for a period of five years. In the course of a large number of transactions, the interaction among the parties was necessarily accompanied by trust and personal regard. But nothing in the record shows that the basic relationship of broker and principal was transcended. The trial court found essentially that Friedman ran his own business and that appellees had a minimal role in the direction and operation of his investment enterprises. The only independent action they took was to perfect a transfer to them which had been made to secure a debt. The court, having rejected appellant's contention that appellees became insiders of his business, concluded that the one-year preference period for avoiding the

---

**18.** Appellant also sought to have costs imposed against appellees' counsel as a result of the last-minute continuance of the trial due to counsel's illness. Appellant has similarly presented

no evidence to indicate that the trial court's refusal to impose costs was an abuse of discretion.

transfer was not available to the estate. Thus the transfer effected by the recordation must stand. The court's ruling that appellees' claim should not be equitably subordinated is also supported by the record. We find no merit in appellants' remaining arguments. The trial court is AFFIRMED in all respects.