**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| In the Matter of: FITNESS HOLDINGS INTERNATIONAL, INC., *Debtor*, | No. 11-56677 |
| | D.C. No. 2:10-cv-00647-AG |
| OFFICIAL COMMITTEE OF UNSECURED CREDITORS, of the ESTATE OF FITNESS HOLDINGS INTERNATIONAL, INC., *Appellant*, | OPINION |
| v. | |
| HANCOCK PARK CAPITAL II, L.P., a Delaware Limited Partnership; PACIFIC WESTERN BANK; KENTON VAN HARTEN; MICHAEL FOURTICQ, SR.; HANCOCK PARK ASSOCIATES, III; HANCOCK PARK ASSOCIATES, *Appellees*. | |

Appeal from the United States District Court
for the Central District of California
Andrew J. Guilford, District Judge, Presiding

Argued and Submitted
February 4, 2013—Pasadena, California

Filed April 30, 2013

Before:  Consuelo M. Callahan, Sandra S. Ikuta,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Ikuta

## SUMMARY[*]

### Bankruptcy

The panel vacated the district court's judgment affirming the bankruptcy court's dismissal of a complaint alleging that a debtor's pre-bankruptcy transfer of funds to its sole shareholder, in repayment of a purported loan, was a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B).

The panel held that a court has the authority to recharacterize a purported loan as an equity investment for purposes of § 548, and that a transaction creates a debt if it creates a "right to payment" under state law.  Because the district court concluded that it lacked the authority to make this determination, the panel remanded the case for further proceedings.

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Richard D. Burstein and Robyn B. Sokol, Ezra Brutzkus Gubner, LLP, Woodland Hills, California; Larry W. Gabriel (argued), Jenkins Mulligan & Gabriel, LLP, Woodland Hills, California; David J. Richardson, The Creditors' Law Group, APC, Los Angeles, California, for Appellants.

David K. Eldan (argued), Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, California; Ralph F. Hirschmann (argued) and Shane W. Tseng, Hirschmann Law Group, Los Angeles, California; Lawrence C. Barth and M. Lance Jasper (argued), Munger, Tolles & Olson, LLP, Los Angeles, California, for Appellees.

**OPINION**

IKUTA, Circuit Judge:

This case presents the question whether a debtor's pre-bankruptcy transfer of funds to its sole shareholder, in repayment of a purported loan, may be a constructively fraudulent transfer under 11 U.S.C. § 548(a)(1)(B). In order to answer this question, we must determine whether a bankruptcy court has the power to recharacterize the purported loan as an equity investment. We hold that a court has the authority to determine whether a transaction creates a debt or an equity interest for purposes of § 548, and that a transaction creates a debt if it creates a "right to payment" under state law. *See* 11 U.S.C. §§ 101(5), (12); *Butner v. United States*, 440 U.S. 48, 54 (1979) (noting that "Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law"). Because the

district court concluded that it lacked authority to make this determination, we vacate the decision below and remand for further proceedings.[1]

# I

Fitness Holdings International, Inc., the debtor in this bankruptcy case, was a home fitness corporation. Before declaring bankruptcy, the company received significant funding from two entities: Hancock Park, its sole shareholder, and Pacific Western Bank. Defendants Kenton Van Harten and Michael Fourticq both served on Fitness Holdings' board of directors. Fourticq was also a manager of Hancock Park.

Between 2003 and 2006, Fitness Holdings executed eleven separate subordinated promissory notes to Hancock Park for a total of $24,276,065. Each note required Fitness Holdings to pay a specified principal amount to Hancock Park, plus interest of ten percent per year, on or before the note's maturity date.[2]

In July 2004, Pacific Western Bank made a $7 million revolving loan and a $5 million installment loan to Fitness Holdings, both of which were secured by all of Fitness Holdings' assets. Hancock Park guaranteed these loans. Fitness Holdings and Pacific Western Bank amended the loan

---

[1] In this opinion, we address only the trustee's claim for avoidance of a constructively fraudulent transfer under § 548(a)(1)(B) and his request for declaratory relief (claims 2 and 7 of the First Amended Complaint). We resolve the remaining claims in a memorandum disposition filed concurrently with this opinion.

[2] The maturity dates of the eleven notes were set for September 30, 2006, November 5, 2006, and October 1, 2009.

agreement multiple times. The amendments eased Fitness Holdings' obligations in various ways, for example, by extending the maturity dates on the revolving loan and waiving past breaches.

Finally, in June 2007, Fitness Holdings and Pacific Western Bank agreed to refinance Fitness Holdings' debt. Under the terms of the agreement, Pacific Western Bank made two loans to Fitness Holdings: a $17 million term loan, and an $8 million revolving line of credit. These loans were also secured by all of Fitness Holdings' assets. The loan agreement provided that upon closing, $8,886,204 would be disbursed to pay off Pacific Western Bank's original secured loan, and $11,995,500 would be disbursed to Hancock Park to pay off its unsecured promissory notes. The payoff of Pacific Western Bank's prior secured loan had the effect of releasing Hancock Park from its guarantee.

These attempts to save Fitness Holdings proved unsuccessful, and the company filed for Chapter 11 bankruptcy on October 20, 2008. A committee of unsecured creditors, acting on behalf of Fitness Holdings and its estate, filed a complaint against Hancock Park, Pacific Western Bank, Van Harten, and Fourticq to recover the payments made to Hancock Park as a result of the refinancing transaction with Pacific Western Bank. The complaint also requested declaratory relief, asking the court to characterize the financing Hancock Park provided to Fitness Holdings in connection with the promissory notes as equity investments in Fitness Holdings, rather than extensions of credit. As a result, the complaint alleged, the transfer of $11,995,500 to Hancock Park was constructively fraudulent.

On January 15, 2010, the bankruptcy court dismissed all claims against Hancock Park with prejudice. The case was subsequently converted to a Chapter 7 filing on April 6, 2010, *In re Fitness Holdings Int'l, Inc.*, No. 2:08-bk-27527-BR, Dkt. # 291 (Bankr. C.D. Cal. April 6, 2010). The following month, the bankruptcy court appointed a trustee for Fitness Holdings, who replaced the committee of unsecured creditors in the litigation.

The trustee appealed the bankruptcy court's dismissal of the complaint to the district court, which affirmed the bankruptcy court and dismissed the case for failure to state a claim. *In re Fitness Holdings Int'l, Inc. (Fitness I)*, No. CV 10-0647 AG, 2011 WL 7763674, *1 (C.D. Cal. Aug. 31, 2011). The district court held that, under longstanding precedent of the Ninth Circuit Bankruptcy Appellate Panel, Hancock Park's advances to Fitness Holdings were loans and, as a matter of law, it was barred from recharacterizing such loans as equity investments. *Id*. at *5 (citing *In re Pacific Express*, 69 B.R. 112, 115 (B.A.P. 9th Cir. 1986)).[3]

The trustee timely appealed, claiming that the district court should have: (1) recharacterized Hancock Park's payment of $11,995,500 to Fitness Holdings as a payment in satisfaction of an equity interest rather than a debt, and then (2) avoided Fitness Holdings' $11,995,500 transfer to Hancock Park as a constructively fraudulent transfer under § 548(a)(1)(B) of the Bankruptcy Code.

---

[3] The district court erred in holding it was bound by a decision of the Bankruptcy Appellate Panel. *See Bank of Maui v. Estate Analysis, Inc.*, 904 F.2d 470, 472 (9th Cir. 1990) ("As article III courts, the district courts must always be free to decline to follow BAP decisions and to formulate their own rules within their jurisdiction.").

## II

We have jurisdiction under 28 U.S.C. §§ 158(d)(1) and 1291. Because the district court dismissed the trustee's complaint for failure to state a claim, we review de novo. *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). In order to survive a motion to dismiss, a party must allege "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. In reviewing a dismissal for failure to state a claim, "[a]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Faulkner v. ADT Sec. Servs. Inc.*, 706 F.3d 1017, 1019 (9th Cir. 2013).

## A

We begin by setting forth the legal framework for fraudulent transfers under § 548(a)(1)(B) of the Bankruptcy Code.[4]

Filing a petition in bankruptcy creates an estate made up of the debtor's assets. *Schwab v. Reilly*, 130 S. Ct. 2652, 2657 (2010). In a Chapter 7 bankruptcy, a trustee is

---

[4] The trustee brought a "recharacterization" claim as a separate cause of action (claim 7 of the First Amended Complaint). We interpret this claim as a request for a determination that Fitness Holdings' transfer to Hancock Park was not made in repayment of a "debt" as that term is defined in the Code. 11 U.S.C. § 101(12).

appointed or elected to administer the estate. 11 U.S.C. §§ 701–04. In order to protect the interests of the estate, a bankruptcy trustee may bring an action to avoid a transfer made before the bankruptcy that is allegedly either intentionally fraudulent, 11 U.S.C. § 548(a)(1)(A), or constructively fraudulent, § 548(a)(1)(B); *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535 (1994). A transfer is constructively fraudulent, and thus can be avoided by the trustee, 11 U.S.C. § 550, if the debtor made the transfer on or within two years before the date of filing the bankruptcy petition, the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," § 548(a)(1)(B)(i), and one of four circumstances obtains.[5]

---

[5] 11 USC § 548(a)(1)(B) (defining constructive fraudulent transfers) provides in pertinent part:

> (a)(1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . . .
>
> > (B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> >
> > > (ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

In construing the statutory requirement that the debtor "received less than a reasonably equivalent value in exchange for such transfer or obligation," § 548(a)(1)(B)(i), we must turn to a series of interlocking statutory definitions. The key phrase in § 548(a)(1)(B)(i), "reasonably equivalent value," is not defined in the Code. *BFP*, 511 U.S. at 535. "Value" is defined, however, and includes the "satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2)(A). Under this definition, "[p]ayment of a pre-existing debt is value, and if the payment is dollar-for-dollar, full value is given." 5 Collier on Bankruptcy ¶ 548.03[5] (16th ed. 2012). Therefore, to the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not constructively fraudulent. *See Freeland v. Enodis Corp.*, 540 F.3d 721, 735 (7th Cir. 2008) (holding that there is "reasonably equivalent value" where "payment of the accrued interest constituted 'dollar-for-dollar forgiveness of

---

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

(IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

a contractual debt.'") (quoting *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D. Conn. 2002)).

We next address the definition of the term "debt." The Bankruptcy Code defines "debt" to mean "liability on a claim." 11 U.S.C. § 101(12); *see also Johnson v. Home State Bank*, 501 U.S. 78, 84 n.5 (1991) (noting that "'debt . . . has a meaning coextensive with that of 'claim.'") (citing *Penn. Dept. of Public Welfare v. Davenport*, 495 U.S. 552, 558 (1990)). "Claim" is defined, in relevant part, to mean "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A). The Code thus broadly defines "debt" as liability on virtually any type of "right to payment."

Under these interlocking definitions, to the extent a transfer is made in satisfaction of a "claim" (i.e., a "right to payment"), that transfer is made for "reasonably equivalent value" for purposes of § 548(a)(1)(B)(i). And a determination that a transfer was made for "reasonably equivalent value" precludes a determination that it was constructively fraudulent under § 548(a)(1)(B). *See In re United Energy Corp.*, 944 F.2d 589, 595–96 (9th Cir. 1991).

## B

This analysis raises the further question of how courts are to determine whether there is a "right to payment" that constitutes a "claim" under the Code. Supreme Court precedent establishes that, unless Congress has spoken, the nature and scope of a right to payment is determined by state

law.[6]  The Supreme Court has "long recognized that the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of Am. v. Pac. Gas & Elec. Co.*, 549 U.S. 443, 450 (2007) (internal quotation marks omitted).  This principle was given its clearest statement in *Butner*, 440 U.S. 48, which held that because "[p]roperty interests are created and defined by state law," *id.* at 55, "[u]nless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding." *Id.*  This means that "when the Bankruptcy Code uses the word 'claim'—which the Code itself defines as a 'right to payment,'—it is usually referring to a right to payment recognized under state law." *Travelers*, 549 U.S. at 451 (internal citation omitted).

   Relying on the *Butner* principle, the Supreme Court held in *Travelers* that a court should not use a federal rule to determine whether a pre-petition contract guaranteeing attorneys' fees created a "right to payment" giving rise to a "claim" under the Code.  *Id.* at 446–47, 453–54. *Travelers* arose from a Ninth Circuit case in which we had relied on circuit precedent holding that attorneys' fees are not recoverable in bankruptcy "for litigating issues peculiar to federal bankruptcy law."  *Id.* at 451 (internal quotation omitted).  In a unanimous reversal, the Supreme Court criticized us for relying "solely on a rule of [our] own

---

   [6] The term "state law" is often used "expansively . . . to refer to all nonbankruptcy law that creates substantive claims." *Grogan v. Garner*, 498 U.S. 279, 284 n.9 (1991).  "We thus mean to include in this term claims that have their source in substantive federal law." *Id*.

creation." *Id*. According to the Court, because the creditor's contractual right to attorneys' fees could be enforceable under the law of California, the pre-petition contract could give rise to a "claim" in bankruptcy, and so the Ninth Circuit erred in holding that, as a per se rule, a right to attorneys' fees for litigating bankruptcy issues never gives rise to a claim in bankruptcy. *Id*. at 450–52; *see also Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 21 (2000) (holding that where there was "no sign that Congress meant to alter" a state substantive right, the *Butner* rule required a creditor's claim to be assessed in light of state law, including the allocation of the burden of proof).

Under the *Butner* principle, therefore, a court may not fashion a rule "solely of its own creation" in determining what constitutes a "claim" for purposes of bankruptcy. Rather, "subject to any qualifying or contrary provisions of the Bankruptcy Code," *Raleigh*, 530 U.S. at 20, a court must determine whether the asserted interest in the debtor's assets is a "right to payment" recognized under state law, *id.*

We now construe § 548(a)(1)(B) in light of the *Butner* principle. Because the Code defines debt as "liability on a claim," § 101(12), and defines "value" as including "satisfaction or securing of a . . . debt," § 548(d)(2)(A), we conclude that a transfer is for "reasonably equivalent value" for purposes of § 548(a)(1)(B)(i) if it is made in repayment of a "claim," i.e., a "right to payment" under state law. Therefore, in an action to avoid a transfer as constructively fraudulent under § 548(a)(1)(B), if any party claims that the transfer constituted the repayment of a debt (and thus was a transfer for "reasonably equivalent value"), the court must determine whether the purported "debt" constituted a right to payment under state law. If it did not, the court may

recharacterize the debtor's obligation to the transferee under state law principles.

Because we hold that a court may recharacterize an obligation that does not constitute "debt" under state law, we disagree with *In re Pacific Express, Inc.*, which held that the Code did not authorize courts to characterize claims as equity or debt, but limited courts to the statutory remedy of equitable subordination under 11 U.S.C. § 510.  69 B.R. 112, 115 (B.A.P. 9th Cir. 1986).  This is incorrect, because "recharacterization and equitable subordination address distinct concerns."  *In re SubMicron Sys.*, 432 F.3d 448, 454 (3d Cir. 2006).  Under the Code, the statutory equitable subordination remedy allows a court, under equitable principles, to subordinate "all or part of an allowed claim to all or part of another allowed claim."  § 510(c)(1).  In contrast, a court considering a motion to avoid a transfer as constructively fraudulent under § 548(a)(1)(B) must determine whether the transfer is for the repayment of a "claim" at all.  Therefore *Pacific Express* erred in holding that the "characterization of claims as equity or debt" is governed by § 510(c).  69 B.R. at 115.[7]

## C

In concluding that the Bankruptcy Code gives courts the authority to recharacterize claims in bankruptcy proceedings, we join our sister circuits, which have reached the same conclusion.  *See In re Lothian Oil*, 650 F.3d 539, 542–43 (5th Cir. 2011); *SubMicron*, 432 F.3d at 454; *In re Dornier*

---

[7] In this opinion, we do not address whether the trustee has adequately pleaded a claim for equitable subordination.  We resolve this issue in the memorandum disposition filed concurrently with this opinion.

*Aviation*, 453 F.3d 225, 231 (4th Cir. 2006); *In re Hedged-Investments Associates, Inc.*, 380 F.3d 1292, 1298 (10th Cir. 2004); *In re Autostyle Plastics, Inc.*, 269 F.3d 726, 748 (6th Cir. 2001). But despite their broad agreement that the Code authorizes courts to recharacterize claims, the circuits have taken different approaches in identifying the legal framework for this recharacterization. *Compare Lothian Oil*, 650 F.3d at 543 (holding that, under the *Butner* principle, courts are required to define claims by reference to state law, and are thus required to recharacterize purported "debt" as equity where state law would treat the asserted interest as an equity interest) *with SubMicron*, 432 F.3d at 454–56 (holding that a court has the equitable authority to recharacterize a transaction and determine if it is more like "debt" or "equity") *and Autostyle Plastics*, 269 F.3d at 749–50 (announcing an eleven-factor test, derived from federal tax law, for determining whether a purported "debt" is in fact "equity").

We agree with the approach adopted by the Fifth Circuit in *Lothian Oil*, 650 F.3d at 543, which is consistent with the *Butner* principle. *Lothian Oil* considered two pre-bankruptcy loan agreements which stated that the debtor would repay the loan in the form of equity interests and royalties, and did not specify interest rates or maturity dates. 650 F.3d at 541. When the debtor asked the court to recharacterize the loans as equity interests, the court construed this as a request to disallow the lender's claim under 11 U.S.C. § 502 on the ground that the purported loans were "unenforceable against the debtor and property of the debtor, under any agreement or applicable law." *Id*. at 543 (quoting 11 U.S.C. § 502(b)(1)). Recognizing the Supreme Court's determination in *Butner* that "'applicable law' is *state* law," *id*. at 543, *Lothian Oil* looked to Texas law, which employed a multi-factor test to

"distinguish between debt and equity," *id*. at 544 (quoting *Arch Petrol., Inc. v. Sharp*, 958 S.W.2d 475, 477 n.3 (Tex. Ct. App. 1997)).  Under Texas law, the interests created by the lender's agreements with the debtor constituted "common equity interests at best," and not debt.  *Id*.  Therefore, the court disallowed the claims and recharacterized them as equity interests.  *Id*.

We believe the Fifth Circuit's approach is more consistent with Supreme Court precedent than that of the circuits that have fashioned a federal test for recharacterizing an alleged debt in reliance on their general equitable authority under 11 U.S.C. § 105(a).[8]  *See, e.g.*, *Autostyle*, 269 F.3d at 749–50; *Hedged-Investments*, 380 F.3d at 1298–99.  Such an equitable approach is inconsistent with Supreme Court precedent requiring us to determine whether a party has a "right to payment," i.e., a "claim," § 101(5), by reference to state law, *see Butner*, 440 U.S. at 55; *Travelers*, 549 U.S. at 451.  Given the Supreme Court's direction, courts may not rely on § 105(a) and federal common law rules "of [their] own creation" to determine whether recharacterization is warranted.  *Travelers*, 549 U.S. at 451; *cf.* James M. Wilton & Stephen Moeller-Sally, *Debt Recharacterization Under*

---

[8] 11 U.S.C. § 105(a) provides:

> The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

*State Law*, 62 Bus. Law. 1257, 1278 (Aug. 2007) ("Federal courts, if they are to follow Supreme Court precedent, cannot create a separate legal standard for the enforceability of insider debt in bankruptcy and should follow the state law of debt recharacterization."). Therefore, we agree with *Lothian Oil* that in order to determine whether a particular obligation owed by the debtor is a "claim" for purposes of bankruptcy law, it is first necessary to determine whether that obligation gives the holder of the obligation a "right to payment" under state law.

## III

We now consider the application of these principles to this case. The question before the district court was whether the trustee's complaint plausibly alleged that Fitness Holdings' transfer of $11,995,500 to Hancock Park was a constructively fraudulent transfer under § 548(a)(1)(B). As explained in our decision today, to survive a motion to dismiss, the trustee was required to plausibly allege that the interests created by Hancock Park's agreements with Fitness Holdings constituted equity investments (rather than debt) under applicable state law, and that therefore Hancock Park had no "right to payment" of $11,995,500 from Fitness Holdings. By making such allegations, the trustee could then claim that Fitness Holdings' transfer was not for reasonably equivalent value. *See* § 548(d)(2)(A).[9] Such allegations,

---

[9] The trustee also contends that Fitness Holdings did not receive "reasonably equivalent value" because it paid down unsecured pre-existing debt with newly acquired secured financing. We reject this argument, because it is not supported by either the Code or our case law. Section 548(d)(2)(A) defines "value" to include the "satisfaction or securing of a present or antecedent debt." Under this definition, a debtor who grants a security interest in its property in exchange for funds has

combined with plausible allegations of the other elements of a claim for a constructively fraudulent transfer under § 548(a)(1)(B), could potentially "nudge" the trustee's claims "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 680 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2006)), and show an entitlement to relief sufficient to withstand a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The district court did not view the trustee's constructively fraudulent transfer claim through this lens.  Because the court erroneously concluded that it was barred from considering whether the complaint plausibly alleged that the promissory notes could be recharacterized as creating equity interests rather than debt, it failed to apply the correct standard in considering whether the trustee's allegation that Fitness Holdings did not receive reasonably equivalent value for its transfer of $11,995,500 to Hancock Park plausibly gave rise to a claim for relief under § 548(a)(1)(B).

Analyzing the trustee's constructive fraudulent transfer claim under the proper legal framework requires the identification of the pertinent legal principles under applicable state law.  Rather than ruling on these issues in the

---

received reasonably equivalent value, *see In re Northern Merch., Inc.*, 371 F.3d 1056, 1059 (9th Cir. 2004), as has a debtor who pays down pre-existing debt.  We therefore see no basis for holding that a debtor who takes both actions simultaneously (obtaining a secured loan and simultaneously paying down pre-existing debt) has received something less than "reasonably equivalent value."  The trustee's reliance on *In re Superior Stamp & Coin Co.*, 223 F.3d 1004, 1008 n.3 (9th Cir. 2000), is misplaced, because that case considered the circumstances that might give rise to a voidable preference under § 547(b), not whether the debtor obtained reasonably equivalent value under § 548.

first instance, *see Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1230 n.6 (9th Cir. 2008), we vacate the district court's dismissal of the complaint's constructive fraudulent transfer claim and remand for further proceedings consistent with this opinion. Each party will bear its own costs on appeal.

**VACATED AND REMANDED.**