FILED

MAR 29 2019

SUSAN M. SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

**NOT FOR PUBLICATION**

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re: | BAP No. NC-18-1042-KuFB |
| CECCHI GORI PICTURES; CECCHI GORI USA, INC., | Bk. Nos. 16-53499-MEH 16-53500-MEH |
| Debtors. | Adv. No. 17-05007-MEH |
| G&G PRODUCTIONS, LLC; GABRIELE ISRAILOVICI; GIOVANNI NAPPI, | |
| Appellants, | |
| v. | **MEMORANDUM**[*] |
| CECCHI GORI PICTURES; CECCHI GORI USA, INC., | |
| Appellees. | |

Argued on November 29, 2018
at San Francisco, California

Submitted on March 28, 2019

Filed – March 29, 2019

Appeal from the United States Bankruptcy Court

---

[*] This disposition is not appropriate for publication. Although it may be cited for whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential value, *see* 9th Cir. BAP Rule 8024-1.

for the Northern District of California

Honorable M. Elaine Hammond, Bankruptcy Judge, Presiding

Appearances:    Michael H. Weiss of Weiss & Spees, LLP argued for
                appellants G&G Productions, LLC, Gabriel E. Israilovici,
                and Giovanni Nappi; Ori Katz of Sheppard Mullin
                Richter & Hampton LLP argued for appellees Cecchi Gori
                Pictures and Cecchi Gori USA, Inc.

Before: KURTZ, FARIS, and BRAND, Bankruptcy Judges.

Cecchi Gori Pictures (CGP) and Cecchi Gori USA, Inc. (CGUSA) (collectively Debtors) filed an adversary complaint against G&G Productions, LLC (G&G) and Gabriele Israilovici (collectively Defendants),[1] alleging claims for, among others, avoidance and recovery of a constructive fraudulent transfer under § 548(a)(1)(B)[2] and California law. Debtors moved for partial summary judgment on these claims. The bankruptcy court granted Debtors' motion and ordered turnover of the transferred property. Defendants appeal from this ruling. For the reasons explained

---

[1] Debtors also named Giovannie Nappi and Vittorio Cecchi Gori as defendants. Mr. Gori defaulted on all claims against him. Mr. Nappi was not named in the constructive fraudulent transfer claims at issue in this appeal.

[2] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

below, we REVERSE.

## FACTS

### A.    Prepetition Events

Debtors, both California corporations, were part of a corporate family of various entities that were owned or controlled by Mr. Gori, an Italian film producer and politician. Debtors produced and developed motion pictures and also held rights to scripts and other intellectual property that potentially could be made into movies. CGUSA served as the holding company, owning the various script related rights; CGP also had some interest in those rights.

In 2006, Mr. Gori's large production holding company Fin.Ma.Vi S.p.A (FINMAVI) filed bankruptcy in Italy with $927 million in debt. Mr. Gori was indicted for criminal fraud in Italy in connection with FINMAVI's collapse.

While Mr. Gori was preoccupied with FINMAVI's bankruptcy, he became involved in a dispute with Gianni Nunnari, Debtors' CEO. Mr. Gori alleged that Mr. Nunnari had engaged in self-dealing and violated his fiduciary obligations to Debtors by trying to divert film projects to his own production company. Mr. Gori terminated Mr. Nunnari. In turn, Mr. Nunnari sued for wrongful termination in the California court, and Mr. Gori filed claims against him for fraud, breach of fiduciary duty and others.

Since Mr. Gori's assets were frozen due to FINMAVI's bankruptcy and the Nunnari litigation was on-going, Mr. Gori turned to Mr. Israilovici to provide consulting services for Debtors and for financial help. In July 2009, Debtors entered into a consulting agreement with Mr. Israilovici whereby he was to act as a liaison between Debtors and Mr. Gori because Mr. Gori seldom traveled to the United States and had little command of the English language.

1.      **The Loan**

From November 2009 to October 2, 2011, Mr. Israilovici lent Debtors a total of $1.5 million. For each loan, Mr. Gori signed and dated receipts personally and in the name of, and on behalf of, Debtors, which he delivered to Mr. Israilovici. Mr. Gori represented to Mr. Israilovici that Debtors would use the advances to cover the attorney's fees and expenses to the law firm Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP (Wolf Rifkin) in connection with the Nunnari litigation and pay certain operating expenses. Mr. Gori later admitted that he did not use the funds for those purposes and that Debtors received none of the funds.

2.      **The Promissory Note**

A promissory note dated November 20, 2012 (Note) evidencing the loan defined the "Borrower" as Mr. Gori, CGP and CGUSA. The Borrower granted Mr. Israilovici a security interest in "scripts, contracts, brands" (Security) until the Note was paid in full. The Note had a maturity date of

4

January 15, 2015. If the Borrower defaulted in payment under the terms of the Note or after demand for ten days, the Security would be immediately provided to the lender, Mr. Israilovici. Mr. Gori signed the Note in his individual capacity and on behalf of Debtors. Mr. Israilovici later testified that he documented the loan at this time because Mr. Gori failed to pay him for consulting services that he provided to Debtors even though the Nunnari litigation had settled for over $5.45 million.

### 3. The Private Agreement

On November 29, 2012, Mr. Gori, personally and as CEO of Debtors, entered into a private agreement with Mr. Israilovici (Private Agreement). Mr. Gori acknowledged the $1.5 million loan made by Mr. Israilovici and promised to pay that loan and the $1 million owed to Mr. Israilovici for consulting services. Mr. Gori also gave Mr. Israilovici the authority to operate Debtors for the purpose of making a number of films abroad and transferred the "Cecchi Gori" trademark "immediately" to Mr. Israilovici. The Private Agreement stated that if Mr. Gori did not pay Mr. Israilovici $2.5 million by January 15, 2015, Mr. Gori would transfer to Mr. Israilovici (1) all the rights pertaining to the scripts listed in the attachment to the agreement; (2) all the rights pertaining to remakes of the films produced by Mr. Gori or his companies; and (3) the rights deriving from the film entitled *Silence*.

Mr. Israilovici later declared in connection with the summary

judgment proceedings that the Cecchi Gori trademark rights and rights pertaining to the remakes of Mr. Gori's films that were transferred to him in the Private Agreement had not been previously transferred to Debtors. Accordingly, Mr. Israilovici maintained that these rights were the separate rights of Mr. Gori (Separate Gori Property) and did not belong to Debtors.

### 4. The First Assignment

Mr. Gori did not pay Mr. Israilovici by the January 15, 2015 due date. Accordingly, on April 1, 2015, Mr. Gori, acting for Debtors, transferred some or all of Debtors' assets consisting of (1) forty-two film projects (Assets); (2) film rights pertaining to the remakes of films produced by Mr. Gori or his companies; (3) all Mr. Gori's rights derived from the film entitled *Silence*, including but not limited to all Mr. Gori's rights pertaining to a purchase agreement dated August 9, 2013, between Mr. Gori, as owner, and Georgia Film Fund Twenty One, LLC, as purchaser; (4) intellectual property rights including the trademark and brand name Cecchi Gori; and (5) Mr. Gori's contractual rights arising out of certain settlement agreements (First Assignment).

The First Assignment acknowledged that the parties entered into the Private Agreement dated November 29, 2012, whereby Mr. Gori, CGP and CGUSA, defined as the "Assignor," agreed to repay Mr. Israilovici certain monies by January 15, 2015 and, if they failed to make that payment, the transfer of the assets reflected in the Private Agreement became effective

6

January 15, 2015. The First Assignment further stated that it was an agreement to "formally codify the transfer of any and all rights held by the Assignor in those assets described in the 2012 [Private] Agreement, as well as any and all rights held by Assignor in certain other assets," a complete list of which was attached as Exhibit A. That exhibit listed forty-two scripts, film rights, intellectual property rights, and contractual rights.

The First Assignment further stated:

[F]or good and valuable consideration, the mutual receipt and sufficiency of which is hereby acknowledged, the Parties hereto agree as follows:

. . .

2.  Consideration: In consideration for Assignor's assignment of the Assets, Assignee has paid to Assignor as full compensation One Dollar ($1.00), the receipt and sufficiency of which is hereby acknowledged.

. . .

8.  Entire Agreement: This Agreement (together with all attachments hereto) expresses the entire understanding of the parties hereto with respect to the matters contained herein and supersedes any former agreements, understandings and representations relating to the subject matter hereof. This Agreement cannot be modified or amended except by an instrument in writing signed by the parties hereto. This agreement may be executed in counterparts, and faxed or electronic signatures are effective.

**5.  The Second Assignment**

On the same day as the First Assignment, Mr. Israilovici and Mr. Gori's personal attorney, Mr. Nappi, formed G&G. Mr. Israilovici then

7

immediately re-transferred the Assets and Separate Gori Property to G&G under an assignment and assumption agreement.

G&G's operating agreement showed that Mr. Israilovici and Mr. Nappi were the sole members of G&G, with Mr. Israilovici acting as manager (Operating Agreement). Mr. Israilovici and Mr. Nappi each held 50% of the membership interests in G&G. Mr. Israilovici's contribution of the Assets was valued at $2 million and Mr. Nappi's contribution, consisting of all his rights to a Jean-Michel Basquiat painting entitled *Wine of Babylon*, was also valued at $2 million.

### 6. Sale of the Assets to Fabrica Services, Inc.

A year after the First and Second Assignments, on April 16, 2016, G&G sold the Assets and Separate Gori Property to Fabrica Services, Inc. (Fabrica) for $300,000, with additional payments to follow per agreement between the parties (Fabrica Agreement).

Fabrica's initial $300,000 payment was allocated as follows: $150,000 for a 50% interest in one asset (the project known as *The Easy Life*), $30,000 for the rights to the Cecchi Gori Name, and $120,000 for exclusivity for five years in connection with the licensing to third parties or acquisition by Fabrica of certain rights to the Assets.

### B. Bankruptcy Events

CGP and CGUSA filed their chapter 11 petitions in December 2016. The bankruptcy court entered an order directing the joint administration of

8

the estates.

On April 6, 2017, Mr. Israilovici filed a proof of claim for $2.5 million based on the $1 million due to him for consulting services and the $1.5 million due under the Note.

**1.    The Adversary Proceeding**

In February 2017, Debtors filed an adversary proceeding against the Defendants. Debtors alleged eight claims for relief, only two of which are relevant here. In the third claim for relief, Debtors alleged that the transfer of the Assets was constructively fraudulent under § 548(a)(1)(B). In the fifth claim for relief, Debtors alleged that the transfer of the Assets was constructively fraudulent under Cal. Civ. Code §§ 3439.04(a)(2). In both claims, Debtors sought to avoid and recover the Assets from Mr. Israilovici, the initial transferee, and G&G, the subsequent transferee.

Defendants answered the complaint with blanket denials and asserted numerous affirmative defenses, including that Mr. Israilovici cancelled his prior $1.5 million loan to Debtors in exchange for the transfer of the Assets.

**2.    Debtors' Motion For Partial Summary Judgment**

Debtors moved for partial summary judgment on their constructive fraudulent transfer claims. Debtors maintained that it was undisputed that there was a transfer from Debtors to Defendants and that Debtors were rendered insolvent on the date of and after the transfer of the Assets.

9

They further argued that there was no dispute that Debtors received $1.00 in consideration of the transfer as stated in the First Assignment, and that this was essentially "no value." Debtors argued that the analysis for "reasonably equivalent value" began and ended with the First Assignment because it was fully integrated by its terms and made no mention of the satisfaction of any present or antecedent debt owing by Debtors to Mr. Israilovici. Debtors maintained that the bankruptcy court was prohibited from considering any extrinsic evidence to the contrary.

Debtors further asserted that the conduct and admissions of both G&G and Mr. Israilovici showed that the value of the Assets was materially in excess of $1.00. They pointed to the Operating Agreement where the Assets were given a fair market value of $2 million at the time of the transfer. They further noted that the Fabrica Agreement showed that $150,000 was allocated for a 50% interest in one of the Assets (*The Easy Life*). According to Debtors, this evidence established that the fair valuation of a small portion of the Assets was worth more than $1.00.

Finally, Debtors maintained that the transfer of the Assets did not result in payment of pre-existing debt allegedly owed by Debtors to Mr. Israilovici and that his loans neither directly nor indirectly benefitted Debtors since none of the monies went to them.

Debtors submitted several declarations in support of their motion.

Declaration of Mr. Katz: The declaration of Mr. Ori Katz, counsel for

10

Debtors, attached a copy of (1) Mr. Israilovici's declaration filed in the adversary proceeding; (2) the First Assignment; (3) the agreement that G&G entered into with Fabrica; (4) the Operating Agreement of G&G; (5) an accounting of the initial $300,000 payment Fabrica made to G&G in connection with the Fabrica Agreement; (7) the specific pages of Mr. Israilovici's deposition taken March 24, 2016 filed in *G&G Prods., LLC v. Rusic*, No. 15-02796, 2016 WL 38803032 (C.D. Cal. July 6, 2016); and (8) the specific pages of Mr. Nappi's deposition taken May 7, 2016, filed in the *Rusic* matter.

Declaration of Mr. de Camara: Andrew de Camara, the chief executive officer for both Debtors, testified that Debtors had no assets of material value after the transaction on April 1, 2015, whereby Debtors assigned the Assets to Mr. Israilovici. He further testified that a review of all deposits to Debtors of $10,000 or more showed that none of the money made its way directly from Mr. Israilovici or in the form of transfer through Mr. Gori, to either debtor or Wolf Rifkin for purposes of the Nunnari litigation.

Declaration of Mr. Rosenbaum: Mark Rosenbaum, a partner with the law firm of Wolf Rifkin, acted as counsel to Debtors and Mr. Gori during the period from April 2009 to November 2012 in connection with the Nunnari litigation. Mr. Rosenbaum declared that after June 24, 2009, Wolf Rifkin received no payments in connection with the Nunnari litigation

11

from Mr. Gori or Debtors.

Declaration of Mr. Jayarantna: Padmal Jayarantna, an employee of City National Bank (CNB) filed a declaration pertaining to the bank accounts of Debtors and attached statements, checks and wires for the time periods reflected. This declaration was submitted to show that Debtors' bank account at CNB had a de minimis balance at all relevant times until it was closed in July 2015.

**3.    Defendants' Opposition**

In their opposition, Defendants conceded the following: (1) there was a transfer; (2) Debtors were or were rendered insolvent at the time of the transfer; and (3) despite Mr. Gori's representations, they could locate no evidence that the funds advanced by Mr. Israilovici benefitted Debtors. Defendants did not claim that Debtors received an "indirect benefit" from the advances.

Defendants argued, however, that there were triable issues of fact on whether Mr. Israilovici had given reasonably equivalent value to Debtors in exchange for the Assets. First, Defendants asserted that the transfer was in satisfaction of a valid obligation of Debtors to Mr. Israilovici for $1.5 million. Defendants further explained that Mr. Israilovici initially did not recall that he had surrendered the original Note to Mr. Gori when he filed his proof of claim. However, Mr. Gori confirmed that he obtained the original Note shortly after the First Assignment. According to Defendants,

once the bankruptcy court took the surrender of the Note into account, an issue of fact arose as to whether Debtors received value for the Assets.

Defendants also maintained that there was a triable issue of fact as to whether the Assets had any value for Debtors' creditors. Defendants argued that if the $1.5 million debt was discharged, the alleged $2 million value as reflected in the G&G contribution agreement might still be considered reasonably equivalent. Defendants further pointed out that Debtors submitted no expert evidence on the value of the Assets. According to Defendants, the Assets had almost no independent value to creditors of Debtors unless coupled with the Separate Gori Property which was transferred to Mr. Israilovici in the 2012 Private Agreement; i.e., the trademark rights to the Cecchi Gori name and rights pertaining to the remake of over three hundred films produced by Mr. Gori or his companies. Defendants argued that these separate rights, which were transferred to Fabrica, did not belong to Debtors. Defendants pointed to the declaration of Mr. Pavlovich, the principal of Fabrica, who declared that the Assets had no value to Fabrica without the Separate Gori Property; i.e., use of the Cecchi Gori trademark.

Next, Defendants asserted that the script rights Debtors transferred to Mr. Israilovici were "contingent" and thus it was necessary to discount the face value of the Assets, if any, by the probability that the contingency would occur. Defendants explained that whether the Assets could be

turned into cash depended upon whether a production company agreed to buy a script or project for which production financing had been arranged and the script becomes a successful film. Defendants argued that Debtors had to show whether any such contingency might occur at the time of the First Assignment on April 1, 2015. Without evidence that the contingency might occur, Defendants contended that the expected value was zero, citing *Hayden v. Denos (In re Hayden)*, Bankr. No. 1:14-BK-11187-MT, Adv. No. 1:14-ap-01182-MT, 2015 WL 9491310, at *11 (Bankr. C.D. Cal. Dec. 28, 2015)(in insolvency analysis, the court observed that if there was a contingent asset or contingent liability, that asset or liability must be reduced to its present, or expected value) (citing *Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.)*, 96 B.R. 275, 278 (9th BAP Cir.1989) (reducing value of a contingent liability to a present value of zero where evidence shows zero liability on claim) (citing *In re Xonics Photochemical, Inc.*, 841 F.2d 198, 200 (7th Cir. 1988) (hypothesizing that where there was a 1% chance that a contingency would occur, the liability is discounted to reflect that chance)).

Lastly, Defendants asserted that unless Debtors had a clear chain of title to the scripts, they had no value. Defendants maintained that of the forty-two film projects transferred, thirteen of those projects had no value since they had been made and Debtors expected no further payments. For fifteen of the projects, Debtors lacked a clear chain of title and thus were

14

worthless. Defendants conceded that Debtors may have owned fourteen projects with clear title, but explained that independent film projects have value only if the chain of title analysis is performed by independent persons such as Thomson Compumark or Dennis Angel. Neither of these independent persons provided a chain of title analysis. Defendants complained that the limited chain of title analysis was done by a lawyer that worked for Mr. Gori or Debtors. According to Defendants, without proof that Debtors had clear title to the fourteen projects, it was impossible to specify a value.

Defendants submitted the following declarations in support of their opposition:

Declaration of Brian L. Berlandi: Brian L. Berlandi served as transactional counsel to Mr. Gori and Debtors from June 2013 to February 2015. Mr. Berlandi declared that there were only twelve titles with apparently clear chain of title transferred to G&G through the April 2015 transfer, but the exhibit attached to his declaration showed fourteen scripts were owned by Debtors. Mr. Berlandi further opined that Debtors did not own thirteen of the titles and that ownership of fifteen scripts were unclear because there were no chain of title documents.

Declaration of Mr. Pavlovich: Mr. Pavlovich testified that the primary motive of Fabrica in entering into the Fabrica Agreement was to acquire the rights to remake *The Easy Life*, one of Mr. Gori's separate rights. According

to Mr. Pavlovich, Fabrica believed that the rights to remake *The Easy Life* belonged to Mr. Gori. Without the remake rights to *The Easy Life* and the use of the "Cecchi Gori" likeness, Fabrica viewed the film projects as having no independent value.

Declaration of Mr. Gori: Mr. Gori's declaration verified the amounts loaned by Mr. Israilovici for the purpose of funding the Nunnari litigation and Debtors' operations. He declared that he did not use the money to fund Debtors' operations or the Nunnari litigation. He further declared that the Private Agreement showed that the Assets and Separate Gori Property would be transferred to Mr. Israilovici if the Note and $1 million owed for Mr. Israilovici's consulting fees were not paid by January 15, 2015. According to Mr. Gori, the amounts were not paid by that date and thus the parties entered into the First Assignment. Finally, Mr. Gori declared that shortly after the execution of the First Assignment on April 1, 2015, someone from Mr. Israilovici's office delivered the original Note to him in Rome.

Supplemental Declaration of Mr. Israilovici: Mr. Israilovici's declaration reiterated much of what was said by Mr. Gori with respect to their various agreements. Mr. Israilovici further declared that when he had filed his proof of claim he did not know that he had surrendered the original Note or that possession of the original was necessary to enforce it.

Mr. Israilovici also explained that developing script rights entails

16

numerous costs which can be recouped only if a production company decides to move forward with the project and obtains financing. Even then, there was no guarantee that the script rights owner will receive full reimbursement for its sunk costs. Mr. Israilovici declared that there were vast uncertainties of getting a film produced and even greater uncertainty that the film would succeed. Accordingly, he concluded that the value of a script right was highly contingent.

Mr. Israilovici further declared that absent independent proof that Debtors had clean title to each of the film projects, it was impossible to value these assets.

Finally, he declared that Mr. Gori's personal right to remake over three hundred films already produced was included in the rights transferred in the First Assignment. Mr. Israilovici declared that Mr. Gori had not previously transferred these rights to Debtors prior to their November 29, 2012 agreement. He stated that the part of the remake rights to *The Easy Life* belonged to him because he acquired them from Mr. Gori on November 29, 2012; whereas, Debtors' rights were limited to a new script based on the concept of the earlier movie. According to Mr. Israilovici, without both rights, neither party could claim clear title and thus could not make the movie.

Mr. Israilovici also declared that the $2 million value attributed to the Assets and other rights contributed to G&G represented his approximate

"cost basis" or "book value" of those assets; i.e., the approximate amount he had paid for or invested in them, not his assessment of the then-current fair market of the Assets. According to Mr. Israilovici, the value assigned was attributed to a combination of Debtors' Assets with the Separate Gori Property which substantially enhanced their value.

4. **The Bankruptcy Court's Ruling**

After a hearing, the bankruptcy court took the matter under submission. On February 2, 2018, the bankruptcy court granted Debtors' motion for partial summary judgment finding that Debtors had shown there was no genuine dispute of material fact on any element of a constructive fraudulent transfer claim under § 548(a)(1)(B).

The court first noted that Defendants conceded that Debtors transferred substantially all of their assets to Mr. Israilovici on April 1, 2015, less than two years from the petition date, and that Debtors were insolvent on the date of that transfer.

In addition, the bankruptcy court found that Debtors did not receive reasonably equivalent value for the transfer of the Assets. Using the two-step analysis for determining reasonable equivalent value that is employed in this Circuit, the bankruptcy court considered whether value was given in exchange for substantially all of Debtors' Assets. Ultimately, the court concluded that the value given was $1.00 as reflected in the First Assignment.

The court reached this conclusion for two reasons. First, it rejected Defendants' argument that more than $1.00 value was given because Defendants surrendered the Note to Mr. Gori thereby suggesting that the $1.5 million debt was satisfied. The bankruptcy court reasoned that the First Assignment was a fully integrated agreement and thus parol evidence was inadmissible. Without parol evidence, the court found that there was no evidence to support Defendants' assertion that the Assets were transferred in satisfaction of a debt.

Next, the court held, as a matter of law, that the underlying Note was not discharged by surrender to Mr. Gori as it was not a negotiable instrument under California law. The bankruptcy court noted that Cal. Com. Code § 3604 permits a lender to discharge an instrument by surrender. An instrument is defined in Cal. Com. Code § 3104(b) as a negotiable instrument. Cal. Comm. Code § 3104(a) defines a negotiable instrument as, among other things, an unconditional promise or order to pay a fixed amount of money, payable to a bearer or to order at the time it is issued or first comes into possession of a holder.

The bankruptcy court held that the Note was not made payable to bearer. The court also noted that to qualify as made "to order," the Note must contain the language "payable to the order of" or similar language. *See Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A. v. Baily*, 710 F. Supp. 737, 738-39 (C.D. Cal. 1989); *Banco Mercantil S.A. v. Sauls, Inc.*, 140 Cal. App. 2d

19

316, 318-19 (1956); Cal. Com. Code § 3109. Since the Note merely stated that it was payable to Lender, it was not a negotiable instrument and its surrender, without more, did not constitute discharge. Accordingly, the only value given by Mr. Israilovici in exchange for the Assets was $1.00 as reflected in the First Assignment.

Turning to the second step of the analysis, the bankruptcy court considered whether the $1.00 value given was reasonably equivalent to the value of the Assets. There was no direct evidence of the value of the Assets. Instead, the court relied upon circumstantial evidence from which it made inferences of value. The bankruptcy court observed that Mr. Israilovici's contemporaneous capital contribution of the Assets to G&G which were valued at $2 million was evidence that the Assets were worth more than $1.00. The bankruptcy court rejected Defendants' argument that Mr. Israilovici's contribution was not reflective of market value, but instead based on book value, because this was contrary to the language in the Operating Agreement and Contribution Agreement which referred to fair market value of the property contributed.

The bankruptcy court also considered whether the Separate Gori Property, which was part of Mr. Israilovici's capital contribution to G&G, was worth $2.0 million thereby leaving the Assets worth nothing or close to $1.00, or whether the value of the separate property was inseparable from the Assets such that one could not determine if they were worth more than

$1.00. The bankruptcy court found that per the terms of the Fabrica Agreement, Fabrica paid $30,000 for use of the Cecchi Gori name in 2016. According to the court, if the Cecchi Gori name was only worth $30,000 in a subsequent sale to Fabrica, Defendants' argument meant that the Separate Gori Property was worth about $1,970,000.00. The court found no evidence showing, directly or indirectly, that these various rights were worth that amount.

In addition, the court noted that the Fabrica Agreement delineated a $5,000 payment for each one of the Assets that held "activity or interest," which was further indication that the Assets themselves held some value, whether it be $5,000 per project as decided by the Fabrica Agreement, or some other amount.

In the end, the court concluded that the First Assignment's net effect was a drain on the estate, as it resulted in all of Debtors' assets being transferred away. Moreover, the bankruptcy court noted that the question before it was merely whether the Assets were worth more than $1.00. Mr. Israilovici's capital contribution and amounts received from the Fabrica Agreement were probative evidence that the Assets were worth more than $1.00 and this evidence was undisputed. Accordingly, the bankruptcy court found that Debtors did not receive reasonably equivalent value for the Assets.

The bankruptcy court then found that the Fabrica Agreement showed

21

there was a market for the Assets and that the market was willing to offer more than $1.00. Although the court found that the Fabrica Agreement was relevant to the finding of value, the court noted that it was not dispositive because it occurred over a year after the First Assignment and Operating Agreement. Nonetheless, the subsequent sale to Fabrica indicated that the Assets were not blindly unloaded to G&G in an effort to lighten a sinking ship - clearly, the Assets were worth a second marketing and sale effort.

In addition, the bankruptcy court found no evidence in the record indicating that the Assets were worthless or should be discounted to zero to reflect their contingent value at the time of the transfer; i.e., that their value was dependent on their future purchase by a production company or on other development. The court distinguished the various cases cited and noted that although the full potential of the Assets' value may only be realized upon sale and production, they retained some value independent of these events.

The bankruptcy court also rejected Defendants' argument that the value of the Assets should be discounted to nothing because at least twenty-eight of the film rights lacked a clear chain of title. The court found that, even assuming that the twenty-eight projects were wholly worthless, at least fourteen of the remaining projects were free from title issues. The bankruptcy court noted that a limited chain of title analysis had been performed on these projects and that they were later sold under the Fabrica

22

Agreement, which was further evidence of some value.

Finally, the bankruptcy court found that Mr. Pavlovich's declaration was not admissible to re-interpret the values assigned within the Fabrica Agreement because the agreement was integrated and there were no ambiguities.

In sum, the bankruptcy court found that Defendants had not shown any disputed issues of material fact regarding the value of the Assets. Therefore, as a matter of law, it was reasonable to infer from the evidence provided by Debtors that the Assets transferred were worth more than $1.00 and thus Debtors did not receive reasonably equivalent value in exchange.

On February 8, 2018, the bankruptcy court entered judgment in favor of Debtors. The judgment, which contained a Civil Rule 54(b) certification, stated that the transfer of the Assets to Defendants was found fraudulent under § 548(a)(1)(B) and Cal. Civ. Code § 3439.04(a)(2). Defendants filed a timely appeal.

## JURISDICTION

The bankruptcy court had jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(H). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

Whether the bankruptcy court erred in finding that, as a matter of law, Mr. Israilovici gave $1.00 in "value" in exchange for the Assets; and

Whether the bankruptcy court erred in finding that, as a matter of law, the $1.00 given in value was not reasonably equivalent to what Defendants received.

**STANDARD OF REVIEW**

We review de novo a bankruptcy court's decision to grant summary judgment. *Marciano v. Fahs (In re Marciano)*, 459 B.R. 27, 35 (9th Cir. BAP 2011), *aff'd*, 708 F.3d 1123 (9th Cir. 2013). De novo review requires that "we consider a matter anew, as if no decision had been rendered previously." *Mele v. Mele (In re Mele)*, 501 B.R. 357, 362 (9th Cir. BAP 2013).

**DISCUSSION**

**A.    Legal Standards: Summary Judgment**

In reviewing the bankruptcy court's decision on a motion for summary judgment, we apply the same standards as the bankruptcy court. Summary judgment is properly granted when no genuine and disputed issues of material fact remain, and, when viewing the evidence most favorably to the non-moving party, the movant is entitled to prevail as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, could affect the outcome of the case. The substantive law will identify which facts are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment stage, the court does not weigh the evidence and determine the truth of the matter,

but determines whether there is a genuine issue for trial. *Id.* at 249.

The moving party bears the initial burden of showing that there is no material factual dispute. If the moving party meets its initial burden, the burden then shifts to the non-moving party to set out, by affidavits or admissible discovery material, specific facts showing a genuine issue for trial. *Celotex*, 477 U.S. at 324. The party opposing summary judgment must produce affirmative evidence that is sufficiently probative on the issue that a jury reasonably could rely on that evidence to decide the issue in his favor at trial. *Matsushita Elec. Indust. Co., Inc. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986). Without such evidence, there is no reason for a trial. *Celotex*, 477 U.S. at 323.

Finally, the evidence presented by the parties must be admissible. *Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("A trial court can [ ] consider [only] admissible evidence in ruling on a motion for summary judgment.").

**B.     Whether Summary Judgment Was Appropriate**

Section 548(a)(1)(B) of the Bankruptcy Code provides that a transfer of property of the debtor can be avoided by the trustee if (1) it occurred within two years of the petition date; (2) the debtor was insolvent on the date that such transfer was made or such obligation incurred, or became insolvent as a result of it; and (3) the debtor received less than reasonably equivalent value in exchange. *See* § 548(a)(1)(B); *see also Official Comm. of*

*Unsecured Creditors v. Hancock Park Capital II, L.P. (In re Fitness Holdings Int'l, Inc.)*, 714 F.3d 1141, 1145 (9th Cir. 2013).

Here, it is undisputed that Debtors had some interest in the forty-two scripts which were transferred to Mr. Israilovici on April 1, 2015, through the First Assignment.[3] This was less than two years from the petition date, and Debtors were insolvent on or after that date. Therefore, only the third element, whether Debtors received less than reasonably equivalent value in exchange for the transfer, is at issue.

An examination into reasonably equivalent value includes two inquires: (1) whether value was given in exchange for the transfer and (2) whether the value of what was transferred was reasonably equivalent to what the debtor received. *Greenspan v. Orrick, Herrington & Sutcliffe LLP (In re Brobeck, Phleger & Harrison LLP)*, 408 B.R. 318, 341 (Bankr. N.D. Cal. 2009). "By its terms and application, the concept of 'reasonably equivalent value' does not demand a precise dollar-for-dollar exchange." *Hasse v. Rainsdon (In re Pringle)*, 495 B.R. 447, 463 (9th Cir. BAP 2013).

---

[3] We observe that under the terms of the Note, Debtors gave Mr. Israilovici a security interest in the Assets. The bankruptcy court did not avoid this transfer or decide that the security interest was unenforceable. A transfer of collateral to a secured creditor is not a fraudulent transfer, so long as the security interest is enforceable and the debtor gets appropriate credit against the debt. *See In re Fitness Holdings Int'l, Inc.*, 714 F.3d at 1145-46 ("to the extent a transfer constitutes repayment of the debtor's antecedent or present debt, the transfer is not constructively fraudulent").

## 1.    Value

As to the first inquiry, "value" for purposes of fraudulent transfer law means "property, or satisfaction or securing of a present or antecedent debt of the debtor." § 548(d)(2). The parties dispute the amount Mr. Israilovici gave in exchange for the Assets. Debtors take the position that Mr. Israilovici gave $1.00 in exchange for the Assets as a matter of law because that amount was reflected in the First Assignment—an integrated agreement, which made no mention that the transfer was made in satisfaction of a debt. Defendants argue that the parol evidence rule does not bar evidence that a particular transaction is a fraudulent transfer. They further contend that once all the admissible evidence is considered, it shows there is a genuine dispute for trial as to whether Debtors' transfer of the Assets was in satisfaction of the $1.5 million debt owed to Mr. Israilovici.

Before considering the summary judgment evidence, we address the applicability of the parol evidence rule.  According to the First Assignment, California law governs the interpretation and enforcement of the agreement between the parties. The parol evidence rule, codified in California Code of Civil Procedure §§ 1856[4] and 1625,[5] generally prohibits

---

[4] Cal. Code Civ. Proc. § 1856 entitled "Terms in writing intended as final expression of agreement; exclusion of parol evidence; exceptions" provides:

(continued...)

27

the introduction of either oral or written extrinsic evidence to vary, alter, or add to the terms of an integrated written agreement. *Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 343 (2004). The rule is one of substantive law based on the concept that a written integrated contract establishes the terms of the agreement between the parties and evidence that contradicts the written terms is irrelevant. *Id.* at 343–44.

The parol evidence rule has no applicability under these circumstances. First, this is not a contract action. The bankruptcy court was not required to interpret the First Assignment to determine the rights and liabilities of the parties. Instead, the court was required to determine whether Debtors' transfer of the Assets to Mr. Israilovici was for reasonably equivalent value. The bankruptcy court could admit any testimony and extrinsic evidence that was probative on this inquiry. *See In re Brobeck, Phleger Harrison LLP,* 408 B.R. at 341 (in constructive fraudulent transfer

---

[4](...continued)
(a) Terms set forth in a writing intended by the parties as a final expression of their agreement with respect to the terms included therein may not be contradicted by evidence of a prior agreement or of a contemporaneous oral agreement.

[5] Cal. Code Civ. Proc. § 1625 entitled "Written contracts; effect on negotiations or stipulations" provides:

The execution of a contract in writing, whether the law requires it to be written or not, supersedes all the negotiations or stipulations concerning its matter which preceded or accompanied the execution of the instrument.

28

analysis, the court examines all the circumstances surrounding the transaction); *see also Brown v. Raygoza (In re Addinton)*, Bankr. No. 12-10029, 2015 WL 3404505, at *4 (Bankr. E.D. Ky. May 27, 2015) (noting that a fraudulent transfer adversary proceeding goes to the substance of the transaction, not the interpretation of the parties' contract).

Second, the existence of an integration clause in a contract does not, in and by itself, exclude parol evidence. California law provides an exception to the parol evidence rule that allows parties to contradict a recital of executed consideration, i.e., money which the contract states has been received. *Doria v. Int'l Union, Allied Ind. Workers of Am., AFL-CIO*, 196 Cal. App. 2d 22, 39 (1961); *see also Shiver v. Liberty Bldg.-Loan Assn.,* 16 Cal.2d 296, 299 (1940); *Simmons v. Cal. Inst. of Tech.,* 34 Cal. 2d 264, 272 (1949). Here, the $1.00 shown as consideration is a recital or mere statement of the receipt of money and not a contract term. Accordingly, the $1.00 consideration is not conclusive and Mr. Israilovici may present extrinsic evidence to show the true value exchanged. In sum, the bankruptcy court erred by excluding admissible evidence on the issue of "value" by application of the parol evidence rule.

Moreover, "a contract may validly include the provisions of a document not physically a part of the basic contract. . . .'It is, of course, the law that the parties may incorporate by reference into their contract the terms of some other document.'" *Shaw v. Regents of Univ. of Cal.*, 58 Cal.

29

App. 4th 44, 54 (1997). "The contract need not recite that it 'incorporates' another document, so long as it 'guide[s] the reader to the incorporated document.'" *Id.*

Here, the First Assignment refers to the Private Agreement. In that agreement, the parties agreed that Debtors would pay Mr. Israilovici $1.5 million for his loan and $1 million for his consulting services no later than January 15, 2015. And, if they failed to make that payment, the transfer of the assets reflected in the Private Agreement became effective January 15, 2015. The First Assignment goes on to say that it is an agreement to "formally codify" the transfer of those assets in the 2012 Private Agreement as well as others. It is unclear whether the bankruptcy court considered this language and the Private Agreement which showed the transfer of the Assets was in satisfaction of a debt owed by Debtors to Mr. Israilovici if not repaid by January 15, 2015.

Finally, Defendants argue that delivery of the original Note to Mr. Gori shows that Mr. Israilovici intended the transfer of the Assets to satisfy the $1.5 million debt. Defendants argue that combined with other admissible evidence such as Mr. Israilovici's lien on the Assets as evidenced by the Note, and Mr. Gori's testimony that the original Note was surrendered at or around the time of the First Assignment, a trier of fact could reasonably infer that Mr. Israilovici intended to cancel the debt by delivering the Note.

Granted, there is contrary evidence in the record from which a trier of fact could also reasonably infer that Mr. Israilovici did not intend to cancel the debt in exchange for the Assets. He filed a proof of claim showing that he was owed the debt and declared that he did not remember delivering the Note to Mr. Gori at the time he filed his claim. Further, Mr. Israilovici did not submit a declaration in opposition to the summary judgment stating that he intended to cancel the Note in exchange for the Assets.

Presented with the contrary evidence, a court's role is only to determine whether a genuine issue of material facts exists, not to make determinations of credibility or weigh conflicting evidence. *Anderson*, 477 U.S. at 255. And the court is required to draw all justifiable inferences in favor of the nonmovants. *Id*. Here, a genuine triable issue remains as to whether the "value" given for the transfer was satisfaction of the $1.5 million debt. If the underlying debt is valid, delivery of the Note coupled with the transfer of the Assets to Mr. Israilovici as contemplated by the First Assignment, Mr. Israilovici's lien on the Assets, and the subsequent delivery of the Note to Mr. Gori, provide sufficient evidence to raise an inference that Debtors' transfer of the Assets to Mr. Israilovici was in satisfaction of the $1.5 million debt. Because of this evidence, a contrary inference from Mr. Israilovici's proof of claim and the lack of a declaration regarding intent cannot be made as a matter of law. Accordingly, summary judgment was not appropriate.

## 2. Reasonably Equivalent to What Was Received

Because of our decision to reverse the bankruptcy court's ruling with respect to the "value" prong of the reasonably equivalent value analysis, it is premature to address any remaining issues relevant to the second prong - whether the value of what was transferred was reasonably equivalent to what Debtors received. Although the bankruptcy court correctly found that the forty-two scripts had value over $1.00, a more precise value may be required.

## CONCLUSION

For the reasons explained above, we REVERSE.